[37 NE3d 690, 16 NYS3d 187]

The People of the State of New York, Respondent, v Matthew Keschner, Appellant.

The People of the State of New York, Respondent, v Aron Goldman, Appellant.

Argued June 1, 2015; decided June 30, 2015

706

**POINTS OF COUNSEL**

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Susan H. Salomon* of counsel), for appellant in the first above-entitled action. I. That Gregory Vinarsky was indispensable to the creation and continued existence of the "St. Nicholas Group" negated the Organized Crime Control Act's (OCCA) "continuity of existence" element, which requires the voiding of appellant's OCCA conviction. (*Jackson v Virginia*, 443 US 307; *People v Western Express Intl., Inc.*, 19 NY3d 652; *Boyle v United States*, 556 US 938; *People v Besser*, 96 NY2d 136; *People v Taylor*, 14 NY3d 727; *People v Chiddick*, 8 NY3d 445; *People v Quattlebaum*, 91 NY2d 744; *People v Carter*, 53 NY2d 113; *People v Wakefield Fin. Corp.*, 155 Misc 2d 775; *People v Cantarella*, 160 Misc 2d 8.) II. Counsel rendered ineffective assistance at two critical junctures: by failing to meaningfully protest the court's error-ridden accomplice-liability instructions and by similarly failing to protest the prosecution's insinuation that uncalled witnesses had refused to cooperate but would have supported its case. (*People v Benevento*, 91 NY2d 708; *People v Baldi*, 54 NY2d 137; *Strickland v Washington*, 466 US 668; *People v Heidgen*, 22 NY3d 259; *People v Turner*, 5 NY3d

476; *People v Stultz*, 2 NY3d 277; *People v McGee*, 20 NY3d 513; *People v Baker*, 14 NY3d 266; *People v Fisher*, 18 NY3d 964; *People v Kaplan*, 76 NY2d 140.) III. The Appellate Division wholly misanalyzed appellant's weight-of-evidence argument that his two insurance-fraud convictions based on "pretext" policies could not be sustained under the court's charge. (*People v Pasley*, 9 NY3d 342; *People v Johnson*, 10 NY3d 875; *People v Noble*, 86 NY2d 814; *People v Dekle*, 56 NY2d 835; *People v Dlugash*, 41 NY2d 725; *People v Malagon*, 50 NY2d 954; *People v Lawrence*, 64 NY2d 200; *People v Thompson*, 99 NY2d 38; *People v Stevens*, 65 AD3d 759; *People v Pignatello*, 15 Misc 3d 833.)

*Jenner & Block LLP*, Washington, D.C. (*Matthew S. Hellman*, of the District of Columbia bar, admitted pro hac vice, of counsel), and *Jenner & Block LLP*, New York City (*Peter B. Pope* and *Eddie A. Jauregui* of counsel), for appellant in the second above-entitled action. I. Aron Goldman's conviction should be reversed because the court's accomplice liability instructions omitted an element of the offense. (*People v Garcia*, 255 AD2d 266; *In re Winship*, 397 US 358; *People v Hill*, 52 AD3d 380; *People v Kelly*, 302 NY 512; *People v Ciaccio*, 47 NY2d 431; *People v Kisoon*, 8 NY3d 129; *People v Leisner*, 73 NY2d 140; *People v Le Mieux*, 51 NY2d 981; *People v Resek*, 3 NY3d 385; *People v Mezon*, 80 NY2d 155.) II. Assuming, arguendo, that Aron Goldman's counsel failed to properly object to the erroneous accomplice liability charge, such failure constitutes ineffective assistance of counsel under New York law. (*People v Benevento*, 91 NY2d 708; *People v Baldi*, 54 NY2d 137; *People v Turner*, 5 NY3d 476; *Strickland v Washington*, 466 US 668; *People v Stultz*, 2 NY3d 277; *Cox v Donnelly*, 387 F3d 193.) III. The People failed to prove the existence of a criminal enterprise as a matter of law and counsel's failure to move for dismissal on this ground constitutes ineffective assistance. (*People v Yarmy*, 171 Misc 2d 13; *People v Conigliaro*, 290 AD2d 87; *People v Cantarella*, 160 Misc 2d 8; *People v Pustilnik*, 14 Misc 3d 1237[A], 2007 NY Slip Op 50407[U]; *People v Western Express Intl., Inc.*, 19 NY3d 652; *People v Doshi*, 93 NY2d 499.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Susan Axelrod* and *Alan Gadlin* of counsel), for respondent in the first and second above-entitled actions. I. The evidence that both defendants committed the crime of enterprise corruption was legally sufficient. (*People v Western Express Intl., Inc.*, 19 NY3d

652; *People v Gray*, 86 NY2d 10; *People v Buckley*, 75 NY2d 843; *People v Sanchez*, 13 NY3d 554; *People v Danielson*, 9 NY3d 342; *Parochial Bus Sys. v Board of Educ. of City of N.Y.*, 60 NY2d 539; *Lawrence Constr. Corp. v State of New York*, 293 NY 634; *Matter of Long v Adirondack Park Agency*, 76 NY2d 416; *People v Anderson*, 66 NY2d 529; *People v Moscatiello*, 149 Misc 2d 752.) II. Contrary to the defendants' unpreserved complaints, the court's accomplice liability charge conveyed the correct rule of law. Moreover, both defendants received effective assistance of trial counsel. (*People v Medina*, 18 NY3d 98; *People v Balls*, 69 NY2d 641; *People v Martin*, 50 NY2d 1029; *People v Umali*, 10 NY3d 417; *People v Drake*, 7 NY3d 28; *People v Carranza*, 18 AD3d 667; *People v Kaplan*, 76 NY2d 140; *People v Hill*, 52 AD3d 380; *People v Satterfield*, 66 NY2d 796; *People v Brown*, 45 NY2d 852.) III. The Appellate Division conducted an appropriate review of the weight of the evidence. (*People v Romero*, 7 NY3d 633; *People v Bleakley*, 69 NY2d 490; *People v Thompson*, 99 NY2d 38; *People v Dekle*, 56 NY2d 835.)

### OPINION OF THE COURT

FAHEY, J.

We hold that the prosecution in an enterprise corruption case may prove that a defendant was a member of a criminal enterprise, with a continuity beyond the scope of individual criminal incidents, without showing that the enterprise would have survived the removal of a key participant. In addition, we conclude that defendants' challenges to the trial court's instructions on accomplice liability are not preserved, and we reject their claims of ineffective assistance of counsel.

### I.

Defendant Matthew Keschner was a licensed chiropractor. Defendant Aron Goldman was licensed to practice medicine. They began working in 2001 at a medical clinic in Manhattan started by Gregory Vinarsky. Vinarsky employed "runners" who listened to police scanners to learn where car accidents had occurred and then approached the accident victims and offered to pay them to go to the clinic. Vinarsky then referred the patients to certain lawyers, who paid kickbacks to him for the referrals. He established relationships with managers of facilities that carried out tests such as MRIs and X rays, who made payments to his clinic in exchange for referrals. He also arranged to receive kickbacks from companies from which durable medical equipment could be ordered. At the clinic, Vinar-

sky ensured that personnel prescribed the maximum number of tests, treatments, and items of medical equipment that no-fault insurance would cover, regardless of a patient's need.

Goldman was listed as the owner of the clinic on incorporation papers. New York requires that the owner of an incorporated medical clinic be licensed to practice medicine, and Vinarsky was not licensed. Keschner incorporated his chiropractic practice under his own name. Goldman, an internist, was on a salary, while Vinarsky's arrangement with Keschner was profit-sharing in exchange for referrals. Vinarsky also had similar referral arrangements with an acupuncturist and a neurologist.

In 2002, Vinarsky shut this clinic down, and opened another, St. Nicholas Medical Clinic, near Columbia University Medical Center, running the same scheme with the same personnel. Vinarsky selected the location of the new clinic, chose its employees, ordered medical supplies, hired and managed the "runners," and oversaw the paper work and billing submitted to the insurance companies. He also opened bank accounts and created management companies into which proceeds were placed. Goldman again became a salaried employee at the clinic, and was named as the owner on incorporation documents. He worked at the clinic three days a week. Vinarsky and Keschner again had a profit-sharing arrangement; Keschner kept 35% of the profits his chiropractic corporation generated, and gave the rest to Vinarsky. Keschner worked three days a week, and hired a second chiropractor to assist him. Vinarsky, meanwhile, hired two physicians to supplement Goldman.

Vinarsky created a preprinted initial evaluation form that the doctors at the clinic completed for each patient. The first entry in its "Treatment Plan" template, for example, was, "The patient advised to attend a supervised physical therapy program on a regular scheduled basis at least 3 times a week." A list of durable medical equipment was similarly designed to maximize the amount that could be billed to insurance companies per patient. The Prognosis section was also pre-printed; it stated for each patient, regardless of actual condition, that the prognosis was "[g]uarded," that "the supporting tissues of the spine [would] become less effective," and that "chronic joint dysfunction" would likely ensue. In accordance with such directives, Keschner told his patients to return for treatment three or four times a week, thus maximizing no-fault insurance reimbursement.

Vinarsky programmed a computer to complete NF-3 No-Fault Insurance Law Verification of Treatment forms so as to indicate that the patient had not suffered from a similar condition in the past and that the injury was the result of an automobile accident. The NF-3 forms listed Keschner as the chiropractor, regardless of who had provided "treatment," and indicated that Goldman had provided biofeedback testing, range of motion tests, and physical therapy, even though these were in fact conducted by other staff, including one minimally trained billing employee.

## II.

In November 2006, the police executed a search warrant at St. Nicholas Medical Clinic. Vinarsky kept the clinic open for about two weeks, but took no new patients. Around this time, Vinarsky opened a new clinic, sharing profits with Keschner again, in which Goldman had no part, but its existence was brief. Vinarsky closed both clinics, and there was no period of time in which either clinic continued to operate in his absence.

In February 2008, Keschner and Goldman were charged, in an 84-count indictment, with enterprise corruption, scheme to defraud in the first degree, and other crimes related to insurance fraud. Vinarsky was indicted as well. In 2009, after investigators executed search warrants at his apartment and at a law office, Vinarsky entered into a cooperation agreement. He pleaded guilty that December to enterprise corruption, grand larceny in the first degree, scheme to defraud in the first degree, and money laundering in the first degree.

The District Attorney's Office sent letters to the majority of the 54 former patients of St. Nicholas Medical Clinic whose names appeared in the indictment, informing them that the Office wished to speak with them about their visits to the clinic. Only three people indicated a willingness to speak with the People.

Keschner and Goldman proceeded to a joint jury trial, commencing in September 2010. A separate defense counsel represented each defendant. The prosecution theory was accomplice liability.

In his opening statement, the prosecutor explained that the jury would hear only from a "representative sample" of the patients treated at the clinic. He stated that the People had tried to contact "many" of "these patients . . . but they didn't

want to talk to the District Attorney's Office, and you will understand why they didn't want to come and talk to the District Attorney's Office when it came time for us investigating this case." The jury subsequently heard testimony from a paralegal in the District Attorney's Office about her futile efforts to interview the patients.

Vinarsky's testimony spelled out the fraudulent scheme in detail. He insisted that he had never told Goldman or Keschner how to treat patients or what to prescribe, or discussed kickbacks or billing or other aspects of operations at the clinic with them. Vinarsky explained, however, that such conversations were unnecessary because, among other things, the preprinted initial evaluation forms he created told the doctors what treatment was "supposed to be done."

As promised, the People also produced several witnesses who had been patients, with legitimate or spurious injuries, at the clinic.

In addition to "chasing ambulances," some of the runners employed by St. Nicholas Medical Clinic and their associates participated in staged car accidents. One man who took part in such an accident, Hernandez, consulted at the clinic with a Dr. Hilaire, who diagnosed the uninjured man with numerous contusions and other trauma to his back and advised him to attend physical therapy three times a week, to use a thermophore, a lumbosacral orthosis, an orthopedic bed board, and an eggcrate mattress, to have multiple X rays and MRIs, and to consult with a chiropractor, an acupuncturist, and an orthopedist. Hernandez saw Keschner a number of times; the chiropractor would either "crack" his back or simply ask him how he was feeling and administer no treatment. NF-3 forms were submitted to GEICO on behalf of Hernandez for X rays, biofeedback training, chiropractic treatments, acupuncture sessions, and a cold water circulating unit. Eventually, Hernandez went to the authorities and admitted his involvement in the scheme.

A runner employed by St. Nicholas Medical Clinic named Perez had been "treated" at the clinic in connection with what the facility's medical records described as three separate motor vehicle accidents, in 2002, 2003 and 2004. In 2002, Goldman "evaluated" Perez and reported that he was suffering from post-concussion syndrome and a left shoulder injury; he wrote two prescriptions for durable medical equipment and advised

Perez to get various tests, X rays and MRIs. Perez also received chiropractic "treatment" from Keschner. In 2003, Goldman "evaluated" Perez following another "accident"; he made the same report, without mentioning the 2002 incident, and wrote a prescription for the same medical equipment. Goldman also recommended chiropractic treatment four times a week, as well as X rays and MRIs, and referred Perez to an orthopedist, a neurologist, and a psychiatrist. In 2004, Goldman conducted the initial evaluation of Perez following a third "accident"; again he used the same list of symptoms, but added a knee injury. The same tests and equipment were prescribed as in previous years, as well as an additional MRI on Perez's knee. St. Nicholas Medical Clinic directly or indirectly billed rental car companies for all the expenses.

The jury heard testimony from a paid confidential informant who had worked as a runner. He and two undercover officers went to the clinic with a fictitious accident report and documents suggesting insurance by GEICO. All three men saw Keschner, who examined them cursorily and did not discuss diagnoses or treatment plans for the invented minor pain symptoms they had reported. The next day, a physician at the clinic, Dr. Pone, recommended that one of the uninjured undercovers have a CT scan and an X ray, and prescribed an ankle brace, a cervical collar, and a special pillow. For several months, the men visited the clinic regularly, seeing a physical therapist and Keschner, who "cracked" their backs. The men were also given "biofeedback tests" but, as video from a concealed camera revealed, only for a minute or two at a time and not in appropriate conditions. A neurologist who claimed to be administering electromyography simply placed needles on the undercovers' arms, without breaking the skin. When one of the undercovers told a receptionist at the clinic that he could not have an MRI she had recommended and suggested that he send his "brother" instead, the receptionist agreed. The same undercover, sent for an X ray, declined the procedure because the room he was directed to at the clinic was filthy and lacked standard protective equipment. The undercovers were periodically given pieces of durable medical equipment, including a special pillow, a heating pad, a lumbar support belt, a water cooler, an ankle brace, and an infrared heat lamp, but they were never told how to use the supplies. St. Nicholas Medical Clinic submitted NF-3s on behalf of the three men to GEICO, listing Goldman as the provider of the physical therapy and all tests, even though the men had never met Goldman.

In addition, the jury heard testimony from two, genuinely injured patients who were seen at St. Nicholas Medical Clinic.

One man, who had dislocated his kneecap, learned of the clinic through a lawyer. The clinic sent a driver to take the injured man to his first consultation. The physician, Pone, did not ask the patient how he had been injured, but recommended physical therapy three times a week, X rays and an MRI; receptionists at the clinic referred him to an acupuncturist and a physical therapist. The patient also saw Keschner and another chiropractor, who administered "treatment" to his spine. Eventually, the man's knee discomfort subsided. The clinic submitted NF-3s to MetLife Insurance for treatment by St. Nicholas Medical Clinic, Keschner, and an acupuncturist.

A woman who had injured her arm when she was struck by a car was given the business card of an attorney, who recommended St. Nicholas Medical Clinic. The clinic sent a driver to pick her up. Pone saw the patient, but did not examine her arm, and noted in medical records that she had sustained acute back trauma and a sprained shoulder and wrist. The woman was advised to attend physical therapy three times a week, have X rays and an MRI of her wrist, receive range of motion testing, use elbow and wrist support, and make appointments with an acupuncturist, an orthopedist, and a psychologist. During subsequent visits, the patient was instructed to take a number of pieces of durable medical equipment from a stack at the clinic, but was not told how to use the supplies. Frustrated because of pressure to see specialists, including a psychologist, she stopped going to the clinic. The clinic submitted NF-3s to GMAC Insurance for both treatment and medical equipment, including a cold water circulating unit prescribed by Keschner.

A biostatistician who had reviewed 2,300 patient files recovered from the clinic testified that Goldman referred all of his patients to a neurologist and almost all to a chiropractor and a physical therapist. The expert also noted that Keschner prescribed four chiropractic visits per week to 93.3% of his patients, physical therapy to 94.4%, neurological or psychiatric consultation to 97.4%, MRIs to 97.5%, and X rays to 99.3%.

The jury also heard expert testimony from a chiropractor that the treatment of the undercovers was not consistent with standard chiropractic care, would have accomplished no benefit, and may have been harmful if the men had actually been injured. Additionally, an expert testified that the number of

tests ordered by clinic staff was greater than necessary, as was the quantity of medical equipment provided. The expert disagreed with the "guarded" prognoses for patients whose medical conditions were improving, and explained various respects in which entries in the clinic's medical records were, medically speaking, meaningless. All in all, the expert opined that many of the clinic's prognoses and prescriptions were inconsistent with the standard of care for physical medicine and rehabilitation.

A forensic accountant testified that the percentage of revenue from insurance companies paid to the clinic that was then transmitted by check to corporations controlled by Vinarsky was consistently 70%. Keschner's corporations regularly paid 65% of money received to Vinarsky's corporations.

At the close of the prosecution's case, Keschner's counsel moved to dismiss his enterprise corruption charge for lack of evidence that, absent Vinarsky's participation, the alleged enterprise could continue to exist. Supreme Court denied the motion, which Goldman's counsel did not join.

The defense then called character witnesses and one expert. Keschner and Goldman did not testify.

Supreme Court's charge on accomplice liability[1] instructed the jury as follows:

> "[A] defendant can be held responsible for the acts of . . . others who are not on trial here, but only if the evidence shows that the defendant under consideration had knowledge of the crime, and intentionally aided or assisted . . . others who are not on trial at this time . . . in committing the crime . . .
>
> "We call this under the law accessorial or accomplice responsibility . . .
>
> " . . . [A] person is criminally responsible for a crime committed by another, if with the mental culpability required for the crime, he solicits, requests, directs, or intentionally aids the other to commit the crime. . . .

---

1. The statutory definition is given in Penal Law § 20.00 ("When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct").

"A defendant cannot be 90 percent guilty or 10 percent guilty, he is either guilty because he had knowledge of the crime, intended that it be committed, and did something to intentionally direct or assist in its commission, or he is not guilty because he had no knowledge of the crime, had no intent to commit it, *and* did not intentionally engage in any conduct to direct or assist in it. . . .

"Again, to be guilty as an accomplice, it must have been proved defendant knew of the crime, intended for it to occur, and intentionally did something to aid or assist in it." (Emphasis added to indicate erroneous use of the word "and.")

Neither defense counsel objected to Supreme Court's instruction. The court was therefore not apprised of its erroneous use of the word "and"—instead of "or"—in the clause that reads "and did not intentionally engage in any conduct to direct or assist in it." Nor was the court's attention drawn to the absence of an intent element in the earlier clause that begins "only if the evidence shows that the defendant under consideration had knowledge of the crime."

During deliberations, the jury sent a note seeking an explanation of accomplice liability. Supreme Court repeated its original instruction, including the single mistaken use of the word "and," almost word for word. In addition, the transcript indicates that Supreme Court told the jury that "to be guilty as an accomplice, it must have been proved that the defendant knew of the crime, intended for it to be committed *or* intentionally engaged in some act or conduct to assist in it" (emphasis added to indicate erroneous use of the word "or"). Thus, in addition to repeating the earlier error, it appears that Supreme Court now mistakenly used an "or" for an "and" in stating the conditions for finding accomplice liability.

Prior to the delivery of the supplemental accomplice liability charge, Keschner's and Goldman's defense attorneys had objected to the charge on the ground that it took "the burden away from the prosecutor in proving accomplice liability beyond a reasonable doubt in each element." They proposed a charge that would specify that the jury find that "[t]he person—the accomplice—sought to be held liable for the conduct of another must possess the particular mental culpability required for the commission of the offense," namely "intent to commit larceny," and that "[t]here must be some affirmative participa-

tion which encourages the perpetrator in the commission of the crime." After the supplemental charge was given, Keschner's counsel, joined by Goldman's, objected to the court's charge for failing to specify that defendants "must have the mental culpability of larceny in order to have accessorial liability." Counsel then began to express a second objection to the accomplice liability charge, uttering the word "Secondly" before being interrupted by the court. In short, once again, neither defense counsel stated an objection to Supreme Court's misuse of conjunctive and disjunctive terms. Moreover, while the attorneys reiterated their objection to the absence of wording referring to intent to commit larceny, they did not mention any concern that its charge might convey to the jury that no mental state other than knowledge of the crime had to be proved.

The jury found both defendants guilty of enterprise corruption, scheme to defraud in the first degree, grand larceny in the first degree (two counts), and money laundering in the second degree, Keschner alone guilty of insurance fraud in the fourth degree (four counts) and falsifying business records in the first degree (two counts), and Goldman alone guilty of money laundering in the first degree, insurance fraud in the third degree (five counts), insurance fraud in the fourth degree (three counts), and falsifying business records in the first degree.

The Appellate Division affirmed Supreme Court's judgments (110 AD3d 216 [1st Dept 2013]). With respect to enterprise corruption, the Appellate Division reasoned that

> "[t]he evidence before the jury amply demonstrates that defendants were engaged in a criminal enterprise overseen by Vinarsky. It embraced more than one clinic, extended over a period of years, and involved a succession of patients whose medical history was used to procure income by an organization structured to facilitate the fraudulent billing of insurers . . . Thus, the jury was warranted in concluding that the criminal enterprise had a continuity that extended beyond any individual patient or transaction" (*id.* at 225).

The Appellate Division rejected challenges by defendants to the accomplice liability instructions on the ground that "the court's instructions, when viewed in their entirety, conveyed the appropriate legal standard" (*id.* at 227 [citation omitted]), without saying whether it found the arguments preserved.

With regard to the prosecutor's opening comments, the Appellate Division ruled that defendants' contentions were unpreserved and in any event lacked merit.

> "The prosecutor's explanation as to why, of the thousands of patients treated at the clinic, only a few would testify does not offend the unsworn witness rule since a prosecutor is obliged to deliver an opening statement that addresses the charges against the accused, what the facts are anticipated to demonstrate and, as pertinent here, the supporting evidence that is to be introduced (*see People v Kurtz*, 51 NY2d 380, 384 [1980], *cert denied* 451 US 911 [1981]). Nor are the prosecutor's comments subject to attack for intimating that uncalled witnesses would have invoked the Fifth Amendment privilege against self-incrimination, since no witness was ever called to the stand for that purpose (*see People v Berg*, 59 NY2d 294, 298-299 [1983]). The People were entitled to explain why only three clinic patients would be testifying, both to address potential jury concerns and to obviate a missing witness charge (*see generally People v Macana*, 84 NY2d 173 [1994])." (*Id.* at 228.)

The Appellate Division concluded that defendants' remaining arguments lacked merit, addressing, among other contentions, a challenge by Keschner to his insurance fraud convictions.

A Judge of this Court granted Goldman and Keschner leave to appeal (22 NY3d 1040 [2013]; 22 NY3d 1041 [2013]). We now affirm, in both appeals.

## III.

Keschner and Goldman challenge their enterprise corruption convictions (*see* Penal Law § 460.20 [1] [a]) on the ground that the continuity of existence element was not demonstrated; Goldman argues that his counsel's failure to move for dismissal of the enterprise corruption charge on this ground amounted to ineffective assistance of counsel. In addition, both defendants contend that Supreme Court's mistakes in its instructions on accomplice liability amounted to reversible error. In the alternative, Goldman argues that if his counsel failed to object to the accomplice liability instructions, the omission constituted ineffective assistance of counsel. Keschner, conceding that his counsel did not object, posits ineffective assistance on

this ground, as well as on the basis that his counsel did not protest the prosecutor's opening remarks regarding patients who would not be testifying or the paralegal's testimony. Finally, Keschner contests the Appellate Division's treatment of his weight of the evidence challenge to the insurance fraud convictions.

## IV.

A defendant is guilty of enterprise corruption, pursuant to Penal Law § 460.20 (1) (a), if he or she, "having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, . . . intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity." The law defines "criminal enterprise" as "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]). The continuity element is at the heart of defendants' first argument.

The enterprise corruption statute is part of New York's Organized Crime Control Act,

> "enacted in 1986 to afford state prosecutors a means of exacting heightened penalties for criminal activity referable to or generative of structured criminal enterprises . . . understood to present a distinct evil by reason of their unique capacity to plan and carry out sophisticated crimes on an ongoing basis while insulating their leadership from detection and prosecution" (*People v Western Express Intl., Inc.*, 19 NY3d 652, 657 [2012]).

It is an enhanced penalty statute targeting organized crime. The statute "specifically demands that the structure be distinct from the predicate illicit pattern" (*id.* at 659).

Keschner, whose defense counsel moved to dismiss on this ground, contends that Vinarsky devised and entirely controlled the illegal actions at St. Nicholas Medical Clinic and that the organization therefore lacked the necessary "continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]) required for a group to constitute a criminal enterprise. Keschner relies in

particular on *People v Yarmy* (171 Misc 2d 13, 20 [Sup Ct, NY County 1996]), which stated, without citation or other support, that "one important factor in determining continuity is whether the organization could exist after the removal—by arrest or otherwise—of any of the participating member(s)." Goldman, for his part, contends that his trial counsel was ineffective for failing to raise this *"Yarmy"* issue.

The argument lacks merit. Were the People required to prove, beyond a reasonable doubt, that a criminal enterprise would survive the removal of a key participant, it would be impossible in most cases to demonstrate the existence of a criminal enterprise. Except where the leading participant was in fact removed some time before the enterprise disbanded, the People would be expected to prove an unknowable proposition concerning a counterfactual scenario in which events occurred differently from the actual world. We have never required such an exercise. Moreover, there is no reason to treat a criminal structure as less deserving of enhanced penalty if its key figure is so essential to the organization that his or her absence would threaten its criminal agenda. A criminal enterprise is no less a criminal enterprise if it has a powerful leader. Finally, if we were to require a criminal enterprise to be able to survive the removal of a key figure, criminal organizations could avoid enhanced penalties simply by placing all control in the hands of one person. It cannot have been the intent of the legislature to allow such a loophole.

Instead, what is meant by the continuity element of the statute is that to be a criminal enterprise, an organization must continue "beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]), and must possess "constancy and capacity exceeding the individual crimes committed under the association's auspices or for its purposes" (*Western Express Intl., Inc.*, 19 NY3d at 658). In other words, the requirement is not that the group would continue in the absence of a key participant, but rather that it continues to exist beyond individual criminal incidents. A team of people who unite to carry out a single crime or a brief series of crimes may lack structure and criminal purpose beyond the criminal actions they carry out; such an ad hoc group is not a criminal enterprise. If a group persists, however, in the form of a "structured, purposeful criminal organization" (*id.* at 659), beyond the time required to commit individual crimes, the continuity element of criminal enterprise is met.

■ ■ Consequently, the People were under no obligation to prove that the criminal enterprise associated with St. Nicholas Medical Clinic would have survived Vinarsky's removal. *Yarmy* is not a correct statement of the law. We reject defendants' argument that the People failed to prove the existence of a criminal enterprise as a matter of law.

## V.

Defendants' other primary argument relates to the charges to the jury on accomplice liability. We must first address the threshold question of preservation. On appeal, Goldman argues that his trial counsel preserved the contention he now raises to the erroneous language in the supplemental instruction.[2] Keschner concedes that his trial counsel did not preserve the issue, but contends that the attorney was ineffective.

Goldman bases his preservation claim on the fact that his trial counsel joined in Keschner's trial counsel's objection to the supplemental charge. Goldman then points out that Keschner's counsel, after raising an objection to the court's refusal to mention intent to commit larceny, began a second objection to the charge, uttering the word "Secondly" before being cut off by the court.

■ We disagree with Goldman's conclusion that this was sufficient to preserve the issue he now raises. The protest of Keschner's counsel did not make known to Supreme Court the specific claimed error with respect to the use of "and" and "or," nor that at one other point its charge might be interpreted as eliminating the mental culpability element. Contrary to the dissent's suggestion, we do not hold that defense counsel was required to state "the precise grammatical means by which the identified error was committed" (dissenting op at 730); however, the protest had to "be specifically directed at the alleged error" (*People v Gray*, 86 NY2d 10, 19 [1995] [internal quotation marks omitted]) in order to preserve the issue. Neither counsel's vague reference to removing "the burden . . . from the prosecutor in proving accomplice liability beyond a reasonable doubt in each element" nor the mere existence of a proposed alternative charge was sufficient for this purpose, particularly in light of the fact that counsel had previously

---

**2.** Goldman contends that he thereby preserves objections to the similar language in the initial jury charge, citing CPL 470.05 (2). We have no occasion to consider this argument because we conclude that he did not preserve the issue in his challenge to the later charge.

raised objections, not to the error claimed on appeal, but to other aspects of the accomplice liability charge. Goldman relies on *People v Resek* (3 NY3d 385, 388 [2004]), but the exchange between Keschner's counsel and the court did not involve "persistent and pointed protests" such that "it is difficult to imagine what more defendant could have done" to focus the trial court's attention on its error (*id.* at 388 n 1). We accept the concession of Keschner's appellate counsel that trial counsel did not preserve the objection with sufficient specificity.

This brings us to the contention that Keschner's and Goldman's defense attorneys rendered ineffective assistance to defendants. Goldman contends that his defense counsel was ineffective to the extent that he failed to object to the accomplice liability charges and because he did not move to dismiss for failure to prove criminal enterprise; we have held, in section IV, that a motion to dismiss on this ground would have lacked merit. Keschner argues that his defense counsel was ineffective not only for failing to challenge the accomplice liability charges but also for not objecting to the prosecutor's opening comments regarding the clinic's patients and the paralegal's related testimony. We agree with the Appellate Division that a challenge to the opening statement would have failed on the merits (*see* 110 AD3d at 228); the same would have been true of any objection to the paralegal's testimony. Therefore, the claim that defendants' trial attorneys were ineffective depends entirely on their failure to object to the jury charges.

The supplemental instruction, addressing the jury note, contains a flaw that is obvious when one reads the transcript. The substitution of "or" for "and" suggested that to be guilty as an accomplice, it is sufficient that a defendant know of a crime, or intend it to be committed, or intentionally engage in some act or conduct to assist in it. Read literally, the instruction said, absurdly, that anyone who knows of a crime is an accomplice to it. Additionally, as defendants emphasize, the charge may have conveyed to the jury that a defendant who unknowingly assists in a crime, but does not intend that it be committed, is criminally liable. That would imply that a person who lacks the state of mind required for the commission of an offense may be held liable for it, directly contradicting the statutory definition of accomplice liability, which states that a defendant is criminally liable for another person's conduct constituting an offense only if defendant acts "with the mental culpability required for the commission" of the offense (Penal

Law § 20.00). In addition, both the initial charge and supplemental charge contained a similar error in stating the conditions for finding a defendant *not* guilty under accomplice liability.

Furthermore, the initial explanation of accomplice liability in both charges ("only if the evidence shows . . . in committing the crime") may have suggested to the jury that it was not necessary for the People to show that defendants had the mental culpability required for the underlying crime, although attention to the subsequent part of the charge would have corrected such a misconception.

In deciding whether a single omission—here, the failure to object to the jury charges—amounts to ineffective assistance of counsel, we are guided by our decision in *People v Turner* (5 NY3d 476 [2005]), which stands for the proposition that "a single failing in an otherwise competent performance" may, in a "rare" case, be "so 'egregious and prejudicial' as to deprive a defendant of his constitutional right" to effective legal representation (*Turner*, 5 NY3d at 480, quoting *People v Caban*, 5 NY3d 143, 152 [2005]). "To rise to that level, the omission must typically involve an issue that is so clear-cut and dispositive that no reasonable defense counsel would have failed to assert it, and it must be evident that the decision to forgo the contention could not have been grounded in a legitimate trial strategy" (*People v McGee*, 20 NY3d 513, 518 [2013]; *see Turner*, 5 NY3d at 481; *People v Barboni*, 21 NY3d 393, 405-406 [2013]).

In applying *Turner*, we have on occasion rejected ineffective assistance challenges when it is clear to the Court that the objection or contention that was omitted would not have been a "winning argument" leading to appellate reversal of a judgment of conviction and sentence (*see e.g. People v Howard*, 22 NY3d 388, 401 [2013]; *People v Rodriguez*, 19 NY3d 166, 174 [2012]; *People v Parilla*, 8 NY3d 654, 660 n 1 [2007]). In other *Turner* cases, we have "express[ed] no opinion on whether the argument, if made, would have been successful" (*People v Carter*, 7 NY3d 875, 877 [2006]), but have concluded that the omitted argument was "not so compelling that a failure to make it amounted to ineffective assistance of counsel" (*id.*; *see e.g. People v Blake*, 24 NY3d 78, 81-82 [2014]; *People v Santiago*, 22 NY3d 740, 751 [2014]; *People v Thompson*, 21 NY3d 555, 561 [2013]; *People v Keating*, 18 NY3d 932, 934 [2012], *rearg denied* 19 NY3d 939 [2012]; *People v Feliciano*, 17 NY3d 14, 28 [2011], *rearg denied* 17 NY3d 848 [2011]; *People v Brunner*, 16

NY3d 820, 821 [2011]; *People v Borrell*, 12 NY3d 365, 369 [2009]).

■ The present appeals fall into the second category. We express no opinion as to whether the flaws in Supreme Court's jury charge and supplemental charge amounted to reversible error. The issue is not clear-cut. On the one hand, the incorrect use of "and" and "or" may "have been perplexing and confusing to an attentive juror," even if "inadvertent" (*People v Kelly*, 302 NY 512, 517 [1951]). On the other hand, "[i]n evaluating a challenged jury instruction, we view the charge as a whole in order to determine whether a claimed deficiency in the jury charge requires reversal" (*People v Medina*, 18 NY3d 98, 104 [2011], citing *People v Umali*, 10 NY3d 417, 426-427 [2008], *rearg denied* 11 NY3d 744 [2008], *cert denied* 556 US 1110 [2009], *writ of habeas corpus denied* 543 Fed Appx 50 [2d Cir 2013]). The test is whether "the 'court's charge, taken as a whole, conveyed to the jury the correct standard' " (*Medina*, 18 NY3d at 104, quoting *People v Drake*, 7 NY3d 28, 32 [2006]). In the initial jury charge, Supreme Court correctly stated the three criteria it set out for accomplice liability immediately before, and shortly after, misstating the conditions under which a defendant would not be guilty as an accomplice. In the supplemental charge, a correct statement immediately preceded the errors.

Whether Supreme Court committed reversible error is a close question. While it is not dispositive that the Appellate Division ruled against defendants on the jury charge issues (*see* 110 AD3d at 227), that is further evidence that this is not one of the rare cases, such as *Turner*, in which a defense counsel's "error is so clear-cut, egregious and decisive that it will overshadow and taint the whole of the representation" (*Blake*, 24 NY3d at 81).

Defendants' remaining contentions lack merit.

Accordingly, in each case, the order of the Appellate Division should be affirmed.

Chief Judge Lippman (dissenting in part). I agree with, and join, that part of the majority opinion declining to import into New York's enterprise corruption statute (Penal Law § 460.20) a requirement that a qualifying "criminal enterprise" (*see* Penal Law § 460.10 [3]) be existentially independent of any particular roster of participants. While a "criminal enterprise" must possess "a continuity of existence . . . beyond the scope of indi-

vidual criminal incidents" (*id.*), the statute contains no require-
ment that an enterprise possess longevity exceeding that of
any of its operatives. If a structured criminal entity, as consti-
tuted, is designed to continue to engage in orchestrated crimi-
nal conduct over a sustained period, and not just to commit
one or a few discrete crimes, it falls within the statute's de-
scription and, indeed, its intendment. Manifestly, an enterprise
crucially dependent on the uncommon abilities of certain
participants is not by reason of that dependency lacking in the
criminal capacity that the statute targets.

This said, I part company with the majority over the
dispositional consequence to be ascribed to the trial court's
plainly erroneous accomplice liability charge.

In initially charging the jury as to accomplice liability—a
crucially important concept where, as here, the prosecution
sought convictions for enterprise corruption by alleging numer-
ous pattern criminal acts (*see* Penal Law § 460.20 [1] [a])
performed by appellants as accomplices—the court, although
presented by appellant Keschner with a request to charge that
the "[defendant must have] commanded or intentionally aided
in the commission of the crime, and that he did so with the
state of mind required for [the] commission of the crime,"[1]
elected to deliver a charge of her own formulation, which devi-
ated from the standard PJI charge. In the course of that charge,
the court, although initially correctly stating the requisites for
accomplice liability, added:

> "A defendant cannot be 90 percent guilty or 10
> percent guilty, he is either guilty because he had
> knowledge of the crime, intended [the crime to] be
> committed, and did something to intentionally
> direct or assist in its commission, *or he is not guilty*
> **because** he had no knowledge of the crime, had no
> intent to commit it, **and** did not intentionally
> engage in any conduct to direct or assist in it"
> (emphases added).

The latter, italicized language was obviously in error and in
fact contradicted the initial correct statement of what must be

---

1. The proposed charge essentially tracked the Penal Law § 20.00 defini-
tion of accessorial liability: "When one person engages in conduct which con-
stitutes an offense, another person is criminally liable for such conduct
when, acting with the mental culpability required for the commission thereof,
he solicits, requests, commands, importunes, or intentionally aids such person
to engage in such conduct."

proved to convict on an accomplice liability theory. Indeed, the latter language effectively shifted the burden to the defense to prove innocence, and to do so by negating each condition of accomplice liability.

Notwithstanding the seriousness of this compound error, no contemporaneous objection was made by either defendant. The jury, however, understandably confused by the inconsistent instructions it had been given, sent out a note asking the court to "explain accomplice culpability." Appellant Keschner's attorney thereafter submitted a written request to charge stressing the need for proof establishing beyond a reasonable doubt both that his client shared the clinic's (i.e., Vinarsky's) criminal intent and that he, with that purpose, aided in the commission of the charged crime. In advocating for the proposed charge, counsel drew the court's attention to the basic problem with the accomplice liability charge the court had given and now proposed to repeat:

> "What I would like to indicate, Your Honor, in your accomplice liability charge, it sets forth that putting the burden -- taking the burden away from the prosecutor in proving accomplice liability beyond a reasonable doubt in each element and places the burden squarely upon the defendant. And still respectfully indicates that the charge that you do propose, or which you already gave in regards to accomplice liability, it is not -- it unduly burdens the defendant."

Defendant Goldman's counsel joined in this protest.

Although noting defendants' exceptions, the court elected to reinstruct the jury by repeating her flawed original charge, with additional language reiterating that a defendant could be liable as an accomplice if he knew of the crime, intended for it to be committed *or* intentionally assisted in its commission. The supplemental accomplice liability charge concluded:

> "*I remind you* that [the] degree to which a defendant participates as an accomplice does not determine his guilt, for the law does not apportion . . . guilt. A defendant cannot be 90 or 10 percent guilty. He is either guilty because he had knowledge of a crime, intended that it be committed, and did something to intentionally direct or assist in its commission. *Or, he is not guilty, **because** he had no*

*knowledge of the crime, had no intent to commit it* **and** *did not intentionally engage in any conduct or act to direct or assist in it.*

"I remind you that merely being present at the scene of a crime or associating with others who commit a crime is not enough to be convicted as an accomplice.

"*Again, to be guilty as an accomplice, it must have been proved that the defendant knew of the crime, intended for it to be committed* **or** *intentionally engaged in some act or conduct to assist in it*" (emphases added).

Perhaps because defendants had just objected to the charge as burden shifting, they did not specifically protest the court's use of "because," "and" and "or." Those expressions were, after all, merely the all too obvious linguistic means to the end—i.e., burden shifting—about which they had moments before complained. Nonetheless, after the court concluded her supplemental charge, in the course of which she addressed an unrelated matter, counsel for defendant Keschner joined by counsel for defendant Goldman attempted to renew and elaborate upon defendants' objections to the court's accessorial liability charge but were cut off by the court, evidently under the impression that the argument she was about to hear had been previously made.

Preliminarily, although the majority is noncommittal about whether the errors in the accomplice liability charges were, if preserved as matters of law, reversible, it is, I believe, plain that they were. Where an erroneous charge allows a general verdict of guilt upon alternative theories, respectively correct and incorrect, and the jury, in finding guilt, cannot be presumed to have done so—much less to have done so unanimously— under the legally correct theory, there must be a reversal (*People v Martinez*, 83 NY2d 26 [1993]; *accord People v Kims*, 24 NY3d 422, 438 [2014]). We have held harmless error analysis inapplicable in this set of circumstances because the problem posed is not how trial errors may or may not have influenced the verdict—a matter about which an appellate court may make an educated judgment based on the entire trial record—but the impenetrable one of whether the jury unanimously convicted upon a valid legal theory when it was given the option of convicting on an invalid theory and could not be presumed to have had the "wit and ability" to adopt the

right theory and reject the wrong one (*see Martinez*, 83 NY2d at 36, quoting *People v Kelly*, 302 NY 512, 517 [1951]).

Certainly, there are cases in which the charge as a whole affords the necessary assurance that the jury, although passingly misinstructed, has not been left with the kind of choice casting unresolvable doubt upon the validity of any consequent verdict of guilt. Charging errors, we have held, are not dispositionally consequential where they are neutralized by the balance of the jury instruction (*see People v Medina*, 18 NY3d 98, 104 [2011]), and here, the trial court *did* on several occasions correctly recite to the jury what would have to be proved to convict defendants as accomplices. The present record, however, does not permit the conclusion that the correct portions of the court's accomplice liability charge were curative. Although the People assert that "the jury was well aware" of what accomplice liability entailed, the jury's request for reinstruction on that subject unmistakably signaled its abiding need for a coherent explanation of that pivotal principle—an explanation that the crucial supplemental charge (*see People v Ciaccio*, 47 NY2d 431, 436 [1979]) very plainly failed to provide. Indeed, the supplemental charge, not only emphatically repeated, but in its final paragraph added to the original error by purporting to reinstruct that appellants could be convicted as accomplices if they either knew of the crime, intended that it be committed "or" intentionally acted to aid in the commission of the charged offenses. The jury could have been no better informed after the supplemental accomplice liability charge than it had been before. The charge, as a whole, left the jury with a dizzying array of theories upon which to convict, only one of which was lawful. In addition to the correct theory—i.e., proof beyond a reasonable doubt that appellants intentionally aided in the commission of the charged crimes with the mental culpability required for their commission (Penal Law § 20.00)—the jury was variously and erroneously instructed that it could convict appellants as accomplices if appellants knew about the underlying crimes, or if they intended for the crimes to be committed, or if they intentionally acted to assist in the crimes' commission. What is more, the jury was relatedly instructed that they could not acquit unless each element of accomplice liability was negated, presumably by appellants. Given the veritable smorgasbord of mostly unlawful conviction options made available to the jury by the court—options that the majority acknowledges "may 'have been perplexing and confusing to an

attentive juror' " (majority op at 724, quoting *People v Kelly*, 302 NY at 517), it is impossible to know whether the verdict was unanimously premised on a lawful theory. This is precisely the situation in which *Martinez* requires reversal.

Of course, even error of this basic sort must be preserved to be reviewable in this Court as a question of law. The majority says that the error was not preserved. I respectfully disagree.

CPL 470.05 (2) provides in relevant part that a question of law is presented where there was a protest to the ruling or instruction challenged on appeal sufficient to afford the trial court "an opportunity of effectively changing the same," and that

> "a party who without success has either expressly or impliedly sought or requested a particular ruling *or instruction*, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered" (emphasis added).

Appellants, it is true, did not object to the trial court's original accomplice liability charge, but prior to the supplemental charge, Keschner's counsel submitted a proposed alternative charge closely tracking Penal Law § 20.00 and thus accurately setting forth the requisites of criminal liability on an accomplice theory. He also lodged a formal objection to the charge the court had initially given, and to which she adhered in her supplemental instruction.

Although observing that the court's supplemental instruction "contains a flaw that is obvious when one reads the transcript" (majority op at 722), the majority holds that appellants' objection, even in conjunction with Keschner's request to charge (*but see* CPL 470.05; *People v Leisner*, 73 NY2d 140, 147 [1989]; *People v Le Mieux*, 51 NY2d 981, 982 [1980]), lacked the specificity necessary to preserve the errors in the supplemental charge for appellate review; appellants' counsel are faulted for failing to explain to the court how its use of "and" and "or" resulted in an erroneous recital of the governing legal principles. But, as the majority itself acknowledges that mechanism was self-evident from a scan of the page off of which the trial court evidently reread its prepared instruction. Undoubtedly, the court would have corrected the charge had its usage

errors been exactly specified. But the relevant question is not what form of words would certainly have prompted the correction, but whether the protest made—including an express request to charge which would, if granted, have cured the defect—was equal to the statutorily identified purpose of affording the court "an opportunity of effectively changing" the flawed instruction.

Appellants' protest correctly identified the basic problem with the proposed charge: in its several obviously objectionable parts it appeared to relieve the prosecution of its burden to prove some or all of the elements of accomplice liability and, concomitantly, to saddle appellants with the task of proving that they did not act as accessories. A more detailed objection focusing on the precise grammatical means by which the identified error was committed should not have been necessary to direct the court's eye to the relatively brief accessory liability charge on the page before her and its "flaw that is obvious when one reads the transcript" (majority op at 722). It is, I believe, patent that appellants' protest afforded the court the statutorily required opportunity to correct the charge and that appellants' present claims of error respecting that charge are therefore preserved for our review.

Concluding, as I do, that appellants' counsel did what was necessary to preserve for appellate scrutiny the legality of the trial court's accomplice liability instructions, I see no need to reach, and in any event no satisfactory ground for, a claim of ineffective assistance.[2] I would note, however, that a failure by counsel effectively to protest reversible charging errors as flagrant and potentially prejudicial as those contained in the instructions here at issue does not seem susceptible of description as comporting with "an objective standard of reasonableness" (see Strickland v Washington, 466 US 668, 688-694 [1984]) and, in my view, would be sufficient to taint the overall representational effort. This entire prosecution, including most notably the top counts alleging enterprise corruption, turned

___

**2.** It is true, as the majority points out, that Keschner's appellate counsel has conceded that his trial counsel did not preserve the legality of the charge for appellate review, but the fairly transparent reason for that concession, which of course is not binding on the Court, is that the viability of an ineffective assistance claim such as the one Keschner now makes turns on whether his trial counsel did in fact fail to make an appropriately focused protest to the erroneous charge. Any argument that counsel did preserve the error for appellate review would seriously undercut the claim of ineffectiveness appellate counsel has elected to pursue.

on whether appellants could be held criminally accountable as accomplices. If counsel had failed effectively to object to a jury instruction relieving and shifting the prosecution's burden to prove that appellants were accomplices within the definition of Penal Law § 20.00, I should think it plain that that failure alone would support a claim for constitutionally ineffective assistance (*see e.g. Cox v Donnelly*, 387 F3d 193 [2004] [failure to object to jury charge relieving the state of its burden to prove intent constitutes ineffective assistance]). The majority's view to the contrary is difficult to square with any reasonable understanding of the utility of defense counsel at a criminal trial.

Accordingly, I would reverse the order of the Appellate Division, and direct a new trial.

Judges READ, PIGOTT, RIVERA and STEIN concur; Chief Judge LIPPMAN dissents in an opinion; Judge ABDUS-SALAAM taking no part.

*In each case*: Order affirmed.