People v Watkins (2024 NY Slip Op 02842)

People v Watkins

2024 NY Slip Op 02842 [42 NY3d 635]

May 23, 2024

Halligan, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, February 19, 2025

[*1]

The People of the State of New York, Respondent,
v
Mark Watkins, Appellant.

Argued April 18, 2024; decided May 23, 2024

People v Watkins, 206 AD3d 452, affirmed.

{**42 NY3d at 637} OPINION OF THE COURT

Halligan, J.

Defendant Mark Watkins contends that his trial counsel was ineffective for failing to request a cross-racial identification instruction at the close of his July 2017 trial. Under our decision in People v Boone—decided after Watkins' trial—such an instruction is now mandatory upon request "when identification is an issue in a criminal case and the identifying witness and defendant appear to be of different races," in light of the higher "likelihood of misidentification" and the "significant disparity between what the psychological research shows and what uninstructed jurors believe" regarding the impact of this cross-race effect (30 NY3d 521, 526, 528-529, 535-536 [2017]). At the time of Watkins' pre-Boone trial, however, a defendant was not entitled to a cross-racial identification instruction upon request; rather, the charge was discretionary. Thus, counsel's failure to request such a charge did not give rise to a single-error ineffective assistance of counsel claim. Accordingly, we affirm the order below.
I.
In July 2017, a jury found Watkins guilty of attempted assault in the first degree, assault in the second degree, and criminal possession of a weapon in the third degree. The charges stemmed from an October 2016 incident in which [*2]65-year-old David Pena was approached by a stranger on the street and struck in the left cheek with a hard object, fracturing his orbital bone. Pena was not looking at the assailant at the time of the attack, and when he was hit, he immediately retreated to a nearby basement to retrieve a wooden stick to protect himself. Upon returning to the street, Pena observed the assailant's face for a period of a few seconds before the assailant turned and walked in the other direction.
When Pena reported the attack three days later, he described the assailant as a Black man who was not much taller than him and wearing black or brown pants, a white 
T-shirt, tennis shoes, and a hoodie. The police showed Pena 462 mugshots, none of which depicted Watkins, and Pena indicated that he did not recognize his attacker among them. Two days later,{**42 NY3d at 638} Pena called 911 and reported that he had spotted his attacker on the street. The police detained a man matching the description Pena gave, but Pena later informed the police that they had detained the wrong person. The next day, Pena again contacted the police and reported that he had seen his attacker on the street. When the police arrived, Pena pointed across the street to Mark Watkins. Watkins was then arrested.
At trial, the only identification evidence was the testimony of Pena, who identified Watkins as his attacker. Pena also testified that Watkins was the man he pointed out to the police on the day of Watkins' arrest and the person depicted in surveillance footage of the attack. The surveillance video introduced at trial confirmed Pena's account of how the assault happened, but the parties and the trial court agreed it was too blurry to depict the assailant's face. Defense counsel argued honest-but-mistaken misidentification.
During the charge conference, the People requested the "Witness Plus" identification charge, which is to be given where "identification is in issue" but "is not premised solely on the testimony of one witness" (CJI2d[NY] Identification—Witness Plus). That charge was appropriate, the People contended, in light of surveillance footage allegedly indicating that Watkins was the perpetrator. Defense counsel instead sought the "One Witness" identification charge, an expanded charge that includes two additional paragraphs directed at cases in which the identification rests entirely on the testimony of a single witness (CJI2d[NY] Identification—One Witness). The trial court agreed that the surveillance footage was not sufficiently probative as to identity and accordingly instructed the jury pursuant to the "One Witness" charge.
Before us, the parties agree that Watkins' identification was cross-racial in nature; they characterize Watkins as Black and Pena as non-Black Hispanic.[FN1] But at trial, there was no questioning on this topic or expert testimony on cross-racial identification. Defense counsel did not request inclusion of the cross-racial portion of the "One Witness" identification charge, and the court did not include it.
On appeal, Watkins argued, as relevant here, that he was deprived of the effective assistance of counsel because his trial{**42 NY3d at 639} attorney did not request a cross-racial identification charge. The Appellate Division affirmed, holding that Watkins' "ineffective assistance of counsel claim is unreviewable on direct appeal because it involves matters not fully explained by the record" (206 AD3d 452, 453 [1st Dept 2022]). Alternatively, the panel concluded that, "to the extent the existing record permits review," Watkins "received effective assistance under the state and federal standards" because he "has not shown that it was objectively unreasonable for counsel to refrain from requesting a jury charge on cross-racial identification" (id.). Noting that Boone had not yet been decided at the time of Watkins' trial, the panel stated that he had "not shown that such a request would have been granted at the time of the trial, or that the absence of such a charge affected the outcome of the case" (id.).
II.
The sole claim before us is that defense counsel was constitutionally ineffective for failing to request the cross-racial portion of the expanded eyewitness identification charge. To prevail on a claim of ineffective assistance of counsel under our State Constitution, "a defendant must establish that counsel failed to provide meaningful representation and thus deprived defendant of a fair trial" (People v Clark, 28 NY3d 556, 562 [2016]). The "meaningful representation" standard requires an assessment of "the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation" (People v Baldi, 54 NY2d 137, 147 [1981]). "Counsel's performance should be objectively evaluated to determine whether it was consistent with strategic decisions of a reasonably competent attorney" (People v Benevento, 91 NY2d 708, 712 [1998] [internal [*3]quotation marks and citation omitted]). The defendant bears the burden of showing both that "counsel's performance [was] constitutionally deficient" (People v Wragg, 26 NY3d 403, 409 [2015]), and "the absence of strategic or other legitimate explanations" for counsel's challenged actions (People v Rivera, 71 NY2d 705, 709 [1988]).
Unlike the federal constitutional standard, which requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (Strickland v Washington, 466 US 668, 694 [1984]), the "focus" of our state standard "is on the fairness of the proceedings as a whole" (People v Stultz, 2 NY3d 277, 284 [2004]). Thus, we treat prejudice as "a {**42 NY3d at 640}significant but not indispensable element in assessing meaningful representation" (People v Caban, 5 NY3d 143, 155-156 [2005] [internal quotation marks omitted]). In that respect, our standard is more protective than its federal counterpart because "under our State Constitution, even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of fair process" (People v Alvarez, 33 NY3d 286, 290 [2019] [internal quotation marks and brackets omitted]).
This appeal presents an ineffective assistance of counsel claim based on a single alleged error. "A single error may qualify as ineffective assistance, but only when the error is sufficiently egregious and prejudicial as to compromise a defendant's right to a fair trial" (Caban, 5 NY3d at 152; see also People v Turner, 5 NY3d 476, 480 [2005] ["there may be cases in which a single failing in an otherwise competent performance is so egregious and prejudicial as to deprive a defendant of his constitutional right" (internal quotation marks omitted)]). "Such cases are rare" (Turner, 5 NY3d at 480) and typically involve the failure to raise a defense "so clear-cut and dispositive that no reasonable defense counsel would have failed to assert it, and it must be evident that the decision to forgo the contention could not have been grounded in a legitimate trial strategy" (People v McGee, 20 NY3d 513, 518 [2013]; see also Turner, 5 NY3d at 481 [omitted defense was "clear-cut and completely dispositive"]; People v Harris, 26 NY3d 321, 327 [2015] [same]).
We have held that an omitted argument does not constitute a "clear-cut and completely dispositive" defense for purposes of a single-error ineffective assistance claim where its success depended on the resolution of novel questions (People v Brunner, 16 NY3d 820, 821 [2011]), where there was a question that remained open in this Court but a similar contention had been rejected by the Appellate Division prior to the defendant's trial (id.), and where the argument did not have "clear prospects" at the time of the representation (People v Borrell, 12 NY3d 365, 369 [2009]). Of particular relevance here, in People v Keschner, we concluded that although the court's flawed charge on accomplice liability may have constituted reversible error if preserved, the omitted argument was "not so compelling that a failure to make it amounted to ineffective assistance of counsel" (25 NY3d 704, 723-724 [2015] [internal quotation marks omitted], quoting People v Carter, 7 NY3d 875, 877 [2006]).{**42 NY3d at 641} Similarly, in People v Blake, we concluded that, although it might have been "a mistake" not to request an adverse inference charge regarding missing evidence before such an instruction was mandatory upon request, "it was not one so obvious and unmitigated by the balance of the representational effort as singly to support a claim for ineffective assistance" (24 NY3d 78, 82 [2014]).
By contrast, in the few cases where we have granted relief on a single-error ineffective assistance of counsel claim, counsel failed to raise an argument that would have conclusively entitled the defendant to a specific action by the trial court. For example, in People v Turner, appellate counsel failed to raise an ineffective assistance of counsel claim that trial counsel, in turn, had omitted a meritorious statute of limitations defense. We noted that the defense, a "clear-cut and completely dispositive" one, "would have prevented the charge [against the defendant] from being submitted" to the jury (5 NY3d at 481, 484). Similarly, in People v Harris, trial counsel failed to seek dismissal of a time-barred charge, though doing so would have been a "certainly efficacious means of . . . avoid[ing] conviction" on that offense (26 NY3d at 325-326). Most recently, in People v Debellis, trial counsel failed to request a charge on the only defense supported by the trial testimony where the defendant "would have been entitled to [the] instruction" upon request and, without it, the jury was effectively precluded from "decid[ing] the case with proper consideration of the sole defense . . . advanced throughout the trial" (40 NY3d 431, 438 [2023]).
No clear entitlement to a cross-racial identification charge existed at the time of Watkins' trial in July 2017. We had provided general guidance on identification charges in People v Whalen, which upheld a trial court's decision to give a minimal identification charge instead of the more expansive one requested by defense counsel (59 NY2d 273, 278-279 [1983]). We noted there the potential for inaccuracy in visual identification evidence and cautioned that the "better practice is to grant a defendant's request and give the expanded charge" (id. at 279). Nonetheless, we held that the failure to do so was not reversible error, provided that the court "gives a general instruction on weighing [*4]witnesses' credibility and . . . states that identification must be proven beyond a reasonable doubt" (id.). We reached the same conclusion in People v Knight, again noting that the better practice is to grant a request for an{**42 NY3d at 642} expanded identification charge but reaffirming that the refusal to do so is not reversible error where the charge given "was a correct statement of the law which sufficiently apprised the jury that the reasonable doubt standard applied to identification" (87 NY2d 873, 874 [1995]; see also id. at 876 [Titone, J., dissenting] [similarly describing an expanded identification charge as "a discretionary matter rather than a legal requirement" under Whalen]; accord People v Lopez, 1 AD3d 168 [1st Dept 2003]). Thus, as we explained in Boone, entitlement to an identification charge had previously been "always a matter for the Trial Judge's discretion, provided that the trial court convey[ed] to the jury that the People have to establish the perpetrator's identity beyond a reasonable doubt" (Boone, 30 NY3d at 536 [citations and internal quotation marks omitted]).
That brings us to the cross-racial identification charge. Prior to 2011, the expanded identification charge included in the pattern Criminal Jury Instructions (CJI), which trial courts had the discretion to modify or refuse to provide, did not include the cross-race effect among the list of factors for the jury to consider in evaluating the accuracy of an identification (CJI2d[NY] Identification—One Witness [as rev Jan. 2008]). In February 2011, the New York State Justice Task Force[FN2] recommended an instruction regarding the cross-race effect (New York State Justice Task Force, Recommendations for Improving Eyewitness Identifications at 5 [2011]). That same year, a model charge on cross-racial identification was added to the pattern identification charges in the CJI, with a notation that both the American Bar Association and the New York State Justice Task Force had recommended such a charge be given if a cross-racial identification was in issue, regardless of whether there was expert testimony on the topic of cross-racial identification (CJI2d[NY] Identification—One Witness n 7 [as rev Jan. 2011]; CJI2d[NY] Identification—Witness Plus n 6 [as rev Jan. 2011]).
In December 2015, a Judge of this Court granted leave to appeal in Boone, which presented the question of whether the trial court committed reversible error in denying a request for the cross-racial portion of the expanded identification charge (see 26 NY3d 1086 [2015]). Prior to this point in time, the Appellate{**42 NY3d at 643} Division had repeatedly upheld the denial of a request for the cross-racial identification charge, sometimes noting that the defense "never placed the issue in evidence during the trial" (People v Boone, 129 AD3d 1099, 1099 [2d Dept 2015] [upholding trial court's denial of request for cross-racial identification charge where there had been no expert testimony or cross-examination concerning a lack of reliability of cross-racial identification]; see also People v Best, 120 AD3d 707, 708 [2d Dept 2014]; People v Washington, 56 AD3d 258, 259 [1st Dept 2008]; People v German, 45 AD3d 861, 861 [2d Dept 2007]; People v Ellison, 8 AD3d 400, 401 [2d Dept 2004]; People v Applewhite, 298 AD2d 136, 137 [1st Dept 2002]; People v Jenkins, 166 AD2d 237, 238 [1st Dept 1990]). That practice continued after leave to appeal was granted in Boone, including in the months shortly before Watkins' July 2017 trial (see e.g. People v Lee, 151 AD3d 982, 983 [2d Dept, June 2017]; People v Dingle, 147 AD3d 1080, 1081 [2d Dept, Feb. 2017]). Indeed, the parties point us to no New York appellate precedent that existed at the time of Watkins' trial holding that a trial court abused its discretion in denying a request for the cross-racial portion of the expanded identification charge.
In December 2017, approximately five months after Watkins' trial, this Court reversed in Boone. We "le[ft] in place . . . the approach set out in Whalen and Knight" for "eyewitness identification charges in general," reiterating that "whether to give the [expanded] charge is discretionary, but it is better practice to grant defendant's request for such a charge" (30 NY3d at 537). Yet we concluded that "recent developments in the understanding of wrongful convictions and cross-racial eyewitness identifications . . . demand a new approach" to instructing jurors on the accuracy of cross-racial identifications in particular (id.). We recognized that there is now a "near consensus among cognitive and social psychologists that people have significantly greater difficulty in accurately identifying members of a different race than in accurately identifying members of their own race," which heightens "the risk of wrongful convictions" in cases "involving cross-racial identifications" (id. at 526). For that reason, we held that a cross-racial [*5]identification instruction would be mandatory upon request "in a case in which a witness's identification of the defendant is at{**42 NY3d at 644} issue, and the identifying witness and defendant appear to be of different races" (id. at 535).[FN3]
Our characterization of this rule as a "new approach" to the specific challenges of cross-racial identifications is notable (Boone, 30 NY3d at 537). Though a cross-racial identification charge had been recommended by both the American Bar Association and the New York State Justice Task Force and added to the CJI, as Judge Troutman's dissent notes (see Troutman, J., dissenting op at 
656-657), this Court's precedent had long vested the trial court with discretion over the content of an eyewitness identification charge (see Whalen, 59 NY2d at 279; Knight, 87 NY2d at 874). The Appellate Division had relied upon that precedent to consistently uphold the trial courts' exercise of discretion to omit the cross-racial portion of the identification charge, where the defendant neither introduced expert testimony regarding the cross-race effect nor cross-examined the People's witnesses about their ability to identify people of the defendant's race (see e.g. People v Boone, 129 AD3d 1099 [2d Dept 2015]). Therefore, we cannot say that a legal argument in support of the cross-racial identification charge had "clear prospects" at the time of the representation (Borrell, 12 NY3d at 369) or was otherwise "so compelling that a failure to make it amounted to ineffective assistance of counsel" (Keschner, 25 NY3d at 723-724). Given the state of the law at the time, the decision to forgo a request for the cross-racial identification charge was not the kind of "egregious" single error that rises to the level of ineffective assistance (Caban, 5 NY3d at 152; see also Clark, 28 NY3d at 565 [trial counsel not ineffective for failing to object to practice that lower courts had sanctioned based on precedent from this Court]).[FN4]
{**42 NY3d at 645}
* * *
Today, as in Boone, we reiterate the importance of instructing jurors "to examine and evaluate the various factors upon which the accuracy of identification depends," including the cross-racial nature, if applicable (Boone, 30 NY3d at 537). We continue to view the cross-racial identification charge as a powerful tool for assisting juries in determining whether there has been a mistaken identification, thereby reducing the risk of wrongful convictions caused by the cross-race effect. Still, Watkins has not shown that, as of July 2017, the failure to request a cross-racial instruction rendered his counsel's performance constitutionally deficient; for that reason, we must affirm the decision below. We have no occasion today to opine on the viability of a similar ineffective assistance of counsel claim premised on the failure to request a cross-racial identification instruction after our decision in Boone made such a charge mandatory upon request.
[*6]
Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge Wilson (concurring).
I concur in the majority opinion because I believe the representation here was constitutionally sufficient. In that regard, it is important to remember that the rule we set out in People v Boone (30 NY3d 521 [2017]) was a rule of evidence we adopted to help improve the fairness of trials, and not a determination that the failure to give such an instruction where a cross-racial identification occurred would always violate due process. Mr. Watkins' counsel did request and obtain the pattern expanded jury charge instructing the jury of the potential unreliability of eyewitness identifications generally, and counsel used facts in the record concerning the victim's delay, condition and opportunity for{**42 NY3d at 646} observation to attack the victim's identification as erroneous. Other than counsel's failure to request the cross-racial identification charge in addition to the expanded unreliability charge, there is no claim that counsel's representation was ineffective. For these reasons, I agree with the majority that counsel's representation did not fall below the constitutional floor.
All defendants deserve better than bare constitutional sufficiency. They deserve high-quality representation—thorough, informed advocacy that fully vindicates their rights and minimizes the chance of wrongful conviction. We should want indigent defense to be funded so that counsel can routinely take the types of steps my dissenting colleagues highlight—rereading the model cross-racial charge in the pattern instructions, researching the ABA and New York State Justice Task Force recommendations contained in a footnote, and noting that our Court had heard argument on the issue and set the case for reargument—and therefore conclude that Mr. Watkins could benefit from a request for the charge in his trial, whether that meant obtaining the charge or preserving the issue for direct appeal if his request was denied.
New York's system of indigent defense is not set up to provide high-quality representation. For decades we have been walking a due process tightrope, providing such minimal support for indigent defense that the question is not whether defense counsel has put on the best possible case for a client, but whether the representation was so deficient as to require the trial to be redone. From the criminal leave applications and cases I have considered, my impression is that the larger criminal defense providers have navigated their constitutional responsibilities through a system of triage, and the smaller or independent providers have simply struggled. Though some progress has been made in recent years, in too many cases we straddle the constitutional minimum. We can and should do better.
I. 
In 1963, the U.S. Supreme Court held that indigent criminal defendants in state courts possess the constitutional right to the assistance of counsel (Gideon v Wainwright, 372 US 335, 339-340 [1963]). However, until recently New York provided no state funding or oversight for indigent defense. Under County Law article 18-B, the [*7]provision of counsel for indigent defendants{**42 NY3d at 647} was (and still is) the responsibility of each individual county. A county may choose to utilize a public defender's office or other institutional defender, or may assign counsel from a roster of private attorneys, colloquially referred to as 18-B attorneys (see County Law § 722). Although it was almost immediately apparent that this resulted in a fractured and unequal system with serious concerns about the quality of representation, the system persisted largely unchanged for over 40 years (see Final Report to the Chief Judge of the State of New York, Commission on the Future of Indigent Defense Services at 8-10 [2006] [hereinafter Kaye Commission Report]).
In response to decades of complaints, in 2003 the legislature established the Indigent Legal Services Fund (ILSF), which created for the first time a state revenue stream for assigned counsel (State Finance Law § 98-b, as added by L 2003, ch 62, § 1, part J, § 12). However, counties continued to provide the bulk of indigent defense funding, and ILSF funding was sourced largely from court-related fees rather than the general fund (see Kaye Commission Report at 20). That limited resource stream made little dent in the scope of what was uniformly described as an indigent defense "crisis" (id. at 4).
Addressing the crisis, Chief Judge Kaye commissioned a landmark report in 2006 that comprehensively chronicled the deficiencies of the indigent defense system. Due to an "acute and chronic lack of funding," a total absence of quality control, and overwhelming caseloads, in many areas "substandard practice ha[d] become the acceptable norm" (id. at 16, 17, 20). The result was a "patchwork," "severely dysfunctional" system "structurally incapable of providing each poor defendant with the effective legal representation that he or she is guaranteed by the Constitution of the United States and the Constitution and laws of the State of New York" (id. at 1, 3). The report recommended the haphazard 18-B system be scrapped entirely and replaced with a system in which the State would both adequately fund indigent defense and enforce performance standards (id. at 27-34).
Shortly thereafter, several criminal defendants filed a class-action lawsuit, Hurrell-Harring v State, alleging that certain New York counties commonly arraigned indigent defendants without counsel and left them unrepresented, or only nominally represented, in crucially important legal proceedings (see Hurrell-Harring v State of New York, 15 NY3d 8, 19-20 [2010]). While that lawsuit was pending, and partially in response to{**42 NY3d at 648} the 2006 report, the legislature created the Office of Indigent Legal Services (ILS) with the mission of improving the quality of defense under article 18-B (Executive Law § 832, as added by L 2010, ch 56, § 1 part E, § 1). When the Hurrell-Harring lawsuit settled in 2014, ILS also took charge of overseeing reforms pursuant to that settlement, which included ensuring counsel at arraignment, lowering caseloads, and improving the overall quality of representation.
Although the Hurrell-Harring reforms were initially limited to the counties named in the lawsuit, in 2016 the legislature unanimously passed a bill that would have extended the reforms statewide and made indigent defense fully state-funded along the lines of the Kaye Commission Report (2016 NY Senate Bill S8114, 2016 NY Assembly Bill A10706). However, the Governor vetoed the legislation, citing cost concerns (Governor's Veto Message, Veto Jacket, Veto 306 of 2016). Instead, the state took on only the costs of implementing the Hurrell-Harring reforms statewide, leaving the baseline system of county funding in place (see Office of Indigent Legal Services, Statewide Plan for Implementing Quality Improvement at 3-4 [2017]; Executive Law § 832 [4], as added by L 2017, ch 59, § 1, part VVV, § 12). Although that legislation fell short of the original proposal, it was nevertheless a significant recognition of the need for state intervention to address the indigent defense crisis, and a significant step forward in improving indigent defense in New York. The legislation charged ILS with developing plans, distributing funding, and overseeing statewide implementation of the Hurrell-Harring reforms.
Those reforms have made a difference. ILS funding has been used by institutional defenders to hire additional attorneys and non-attorney staff, resulting in an increase in compliance with caseload standards (Office of Indigent Legal Services, Statewide Plan for Implementing Quality Improvement and Caseload Relief: Year Five Report at 6 [2023]). Several counties used state funding to create institutional public defender offices, which provide stronger and better-organized representation than rotating assigned attorneys (id.). Providers are increasingly able to participate in ongoing training, consult with more experienced practitioners, and purchase legal research materials—opportunities which, shockingly, cannot be taken for granted in this area (Office of Indigent Legal Services, Performance Measures Annual Report at 10 [2023]).
At the same time, many aspects of the system remain in crisis. Until 2023, pay rates for assigned counsel had stagnated{**42 NY3d at 649} for decades at rates less than half of what lawyers could receive for other comparable work, resulting in a situation where few attorneys would take such cases and those who did were overwhelmed by crushing caseloads (see Testimony of the Office of Indigent Legal Services, Joint Legislative Hearing on the FY 2023-2024 Public Protection Budget at 3 [2023]; [*8]Douglass Dowty, Syracuse's ability to provide Constitutionally mandated lawyers in crisis; 'symbolic boycott' planned over low pay, Syracuse.com, Apr. 15, 2022, https://www.syracuse.com/crime/2022/04/syracuses-ability-to-provide-constitutionally-mandated-lawyers-in-crisis-symbolic-boycott-planned-over-low-pay.html). In 2021-2022, the New York County Lawyers Association and New York State Bar Association filed class-action lawsuits alleging that because of the low rates, individuals who were represented by 18-B lawyers consistently received constitutionally inadequate legal representation (see New York County Lawyers Assn. v State of New York, 2022 NY Slip Op 32476[U], *2 [Sup Ct, NY County 2022]; New York State Bar Assn. v State of New York, Sup Ct, NY County, index No. 160191/2022). The legislature addressed the issue last year by over doubling the pay rate for 18-B attorneys, but it may take time to see the effect of this change on the 18-B attorney pool (see County Law § 722-b, as amended by L 2023, ch 56, § 1, part GG, § 1). In addition, New York City institutional defenders face their own compensation and staffing crisis unrelated to the 18-B issue, with the resulting strain on defense attorneys leading to concerns about the "fundamental fairness" of criminal proceedings (Jonah E. Bromwich, Hundreds Have Left N.Y. Public Defender Offices Over Low Pay, NY Times, June 9, 2022, available at https://www.nytimes.com/2022/06/09/nyregion/nyc-public-defenders-pay.html). Finally, as is well-documented elsewhere, the family defense system, which has never received the same infusion of funding as criminal defense, remains in acute crisis (e.g. Franklin H. Williams Judicial Commission of the New York State Courts, Report on New York City Family Courts at 7-13 [2022]; Testimony of Lawyers for Children to the New York State Senate Committees on Judiciary and Children & Families [2023], available at https://www.nysenate.gov/sites/default/files/admin/structure/media/manage/filefile/a/2023-11/testimony-of-lawyers-for-children.pdf).
Even focusing solely on criminal defense, the modest gains achieved since 2017 are threatened by the failure of funding to keep pace with costs. State fiscal support for indigent defense{**42 NY3d at 650} has remained flat in recent years despite high inflation rates. Therefore, organizations and counties that have hired staff and implemented new programs may be forced to cut back on these reforms without a cost-of-living increase (see Testimony of the New York State Defenders Association, Joint Legislative Public Hearings on the 2024-2025 Executive Budget Proposal at 8 [2024]). Similarly, because the recent increase in the 18-B pay rate is only 50% funded by the state, counties faced with the cost of this increase have threatened to cut back on other areas of public defense to compensate (Richard Lewis, NYSBA Supports Funding of the Indigent Legal Services Fund, Mar. 12, 2024, available at https://nysba.org/nysba-supports-funding-of-the-indigent-legal-services-fund). As noted as far back as the Kaye Commission Report, even the best-intentioned mandates will flounder if forced to compete for scarce and unpredictable county resources.
In 2006, our indigent defense system was "structurally incapable" of ensuring that each defendant would receive the constitutional minimum of "meaningful representation" (Kaye Commission Report at 3; People v Baldi, 54 NY2d 137, 147 [1981]). Though the system has improved, we continue to tread water above that line. Increased state funding and accountability has resulted in working conditions more often reaching what should be the baseline minimum—manageable caseloads, consistent client contact, access to research materials, and ongoing training. However, even those baselines are inconsistent and constantly under threat, with many attorneys still facing overwhelming workloads with little to no support. There is a constant threat that ineffective representation will prevent defendants from receiving a constitutionally fair trial.
Because criminal proceedings often deprive defendants of years of liberty, we can and should expect not only representation that meets the constitutional minimum, but high-quality representation—the type of representation we would hope for if the accused were a family member or friend.[FN*] Defense attorneys should have the time and resources to fully investigate cases; consult with clients, supervisors, and non-legal staff;{**42 NY3d at 651} participate in ongoing training; and access up-to-date research materials. There should be no question of whether the lawyer will meet the constitutional minimum—only whether the lawyer can put on the best possible case for her client.
[*9]
Moving from our current constitutional limbo to a system of high-quality representation would require a significantly greater commitment to fulfilling the promise of "justice for all," recited first by schoolchildren in 1892 and set out in Gideon over 60 years ago. The case before us illustrates the risks of falling back on our commitment to indigent defendants, and the need to instead redouble our efforts to ensure high-quality representation.
II.
Mr. Watkins was tried in New York City in 2016-2017, before the statewide implementation of the Hurrell-Harring reforms. His attorney was not an institutional public defender, but an independent attorney assigned pursuant to County Law 
article 18-B. As noted above, due to the fact that pay for 18-B attorneys remained fixed at the 2004 rate, Mr. Watkins' attorney likely received about half as much compensation for work on this case as he would in federal court or private practice. On that level of pay, many 18-B attorneys were unable to afford support staff, online research services, or private office space (aff of Kim Taylor-Thompson in New York County Lawyers Assn. v State of New York, Sup Ct, NY County, index No. 156916/2021, available at 2022 WL 22310112). Because very few attorneys were willing to work under such conditions, attorneys like Mr. Watkins' suffered from an overwhelming caseload—panel attorneys in nearby courts report having over 100 concurrent cases (Jacob Kaye, Assigned counsel scores pay increase—for now, Queens Daily Eagle, Aug. 2, 2022, available at https://queenseagle.com/all/2022/8/2/assigned-counsel-scores-pay-increase-for-now).
Putting aside constitutional sufficiency, is it right for someone facing decades in prison to be represented by a grossly underpaid attorney with a crushing caseload? Mr. Watkins was charged with attempted first-degree assault, a class C felony, in a case that turned entirely on a single-witness, cross-racial identification. Counsel faced with a situation like this should have time to reread the CJI and carefully investigate the footnote stating that the charge was recommended by the New York State Justice Task Force and American Bar Association,{**42 NY3d at 652} even in the absence of expert testimony. Counsel should have the bandwidth to discuss the instruction with fellow practitioners, and listen to oral argument in our pending decision in Boone addressing the issue. Counsel should have the resources to consider whether, even if trial courts and the Appellate Division often denied the charge without such testimony or similar foundation (see majority op at 
642-643 [collecting cases]), the law might soon change, and to immerse himself in the research drawing a connection between mistaken cross-racial identification and wrongful conviction (see generally Boone, 30 NY3d at 527-530 [collecting sources]). We have failed to resource indigent criminal defense to allow that level of representation across the board.
I agree with the majority that Mr. Watkins was not denied the constitutional minimum of "meaningful representation" (Baldi, 54 NY2d at 147). But all defendants, including those who cannot pay for high-quality representation, deserve better than the constitutional minimum. Adjudicating ineffective-assistance cases may help to establish the floor, but cannot move us higher.

Troutman, J. (dissenting).
Our precedent favors a reversal on this appeal, but the majority declines to follow it despite acknowledging the heightened risk that defendant Mark Watkins was wrongly convicted for these crimes. I cannot acquiesce. We should not hesitate to rectify the injustice caused by the failure of Watkins's trial counsel to request a cross-racial identification charge of the sort contained in New York's Criminal Jury Instructions at the time of trial. Because the importance of instructing juries as to the dangers of cross-racial identifications was widely understood at the time of Watkins's trial, his counsel was ineffective in failing to request such an instruction here, where the victim was a different race than the assailant, a stranger to the assailant, and the only witness in a case where there was no corroborating evidence. I therefore dissent.
I.
In October 2016, a stranger on the street struck 65-year-old David Pena on his left cheek with a hard object, which was "like a piece of cement," fracturing Pena's orbital bone. Pena did not see the assailant when he was attacked. Immediately after being struck, Pena retreated to a nearby basement and{**42 NY3d at 653} retrieved a wooden stick for protection. Upon returning to the street, Pena had a few seconds to observe the assailant's face before the assailant turned and walked away in the opposite direction.
Pena reported the attack to the police three days later, describing the assailant as a Black man who was a little taller than him and wore black or brown pants, a white 
T-shirt, tennis shoes, and a hoodie. The police showed Pena 462 mugshots, none of which depicted Watkins. Pena stated that he did not recognize his assailant among them. Pena called 911 two days later reporting that he had spotted his assailant on the street, whom Pena described as a tall Black man wearing a hat and a blue hoodie. But after an officer detained the man matching that description, Pena told the officer that the man was not the right person, because the man was shorter and heavier than the assailant.
The next day, Pena contacted the police to again report that he had seen his assailant on the street. When the police arrived, Pena pointed out defendant Mark Watkins, who was across the street. The police then arrested Watkins.
Pena's testimony identifying Watkins as his assailant was the only evidence at trial tying Watkins to the crime. Additionally, Pena testified that Watkins was the man he pointed out to the police on the day of Watkins' arrest. Pena also identified Watkins as the person depicted in surveillance footage of the assault, even though the video was too blurry to depict the assailant's face. No other witness made an identification, and the People did not present any corroborating evidence. The sole defense offered by Watkins's counsel was Pena's honest-but-mistaken identification.
Because the surveillance footage was not probative of the assailant's identity, the trial court instructed the jury pursuant to the "One Witness" charge used in cases where the identification at issue rests entirely on the testimony of a single witness (see CJI2d[NY] Identification—One Witness). However, defense counsel failed to request that the court include the cross-racial portion of the "One Witness" identification charge, even though Watkins and Pena were of different races.
[*10]
Watkins was subsequently convicted, upon a jury verdict, of attempted assault in the first degree, assault in the second degree, and criminal possession of a weapon in the third degree. Watkins appealed, arguing, among other things, that{**42 NY3d at 654} he was denied effective assistance of counsel because his trial counsel failed to request a jury charge regarding cross-racial identification.
In affirming Watkins's conviction, the Appellate Division held that Watkins's "ineffective assistance of counsel claim is unreviewable on direct appeal because it involves matters not fully explained by the record" and, furthermore, that Watkins "received effective assistance under the state and federal standards," because he "has not shown that it was objectively unreasonable for counsel to refrain from requesting a jury charge on cross-racial identification" (206 AD3d 452, 453 [1st Dept 2022]). The Court additionally reasoned that Watkins had "not shown that such a request would have been granted at the time of the trial, or that the absence of such a charge affected the outcome of the case" (id.).
II.
"Under the federal standard ineffective assistance of counsel requires both that counsel's performance was deficient and that the deficient performance prejudiced the [defendant]" (People v Nicholson, 26 NY3d 813, 830 [2016] [internal quotation marks omitted], quoting Strickland v Washington, 466 US 668, 687 [1984]). Under our State Constitution, however, " '[t]he core of the inquiry is whether defendant received meaningful representation' " (id., quoting People v Benevento, 91 NY2d 708, 712 [1998]). "Our standard is more protective than the federal standard because 'even in the absence of a reasonable probability of a different outcome, inadequacy of counsel will still warrant reversal whenever a defendant is deprived of a fair trial' " (People v Debellis, 40 NY3d 431, 436 [2023], quoting People v Caban, 5 NY3d 143, 156 [2005]). However, because defendant "bears the burden of establishing his claim that counsel's performance is constitutionally deficient," he "must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged failure" (Nicholson, 26 NY3d at 831).
"Even under the more demanding federal standard, '[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance' " (Debellis, 40 NY3d at 436, quoting Hinton v Alabama, 571 US 263, 274 [2014]). We have repeatedly held that "a failure to present a crucial defense supported by the evidence{**42 NY3d at 655} constitutes ineffective assistance" (id.; see e.g. People v Nesbitt, 20 NY3d 1080 [2013]). Recently, in Debellis we held that a defendant was denied effective assistance of counsel where his counsel's error in failing to request a particular jury charge deprived the defendant of "a jury charge on the only defense supported by the evidence" (40 NY3d at 438).
Here, trial counsel's failure to request a cross-racial identification charge deprived Watkins of effective assistance of counsel. Despite the majority's recognition of the importance of cross-racial identification charges, the majority refuses to find trial counsel ineffective because it does not view the "legal argument in support of the cross-racial identification charge" as having been "so compelling that a failure to make it amounted to ineffective assistance of counsel" (majority op at 
644 [internal quotation marks omitted]). The majority tries to distinguish this case from cases like Debellis because, at the time of trial, this Court was a few months away from issuing its decision in People v Boone holding that whenever "identification is an issue in a criminal case and the identifying witness and defendant appear to be of different races, upon request, a party is entitled to a charge on cross-racial identification" (30 NY3d 521, 526 [2017]). In reaching its conclusion, however, the majority pays short shrift to the generally understood importance and prevalence of cross-racial identification charges at the time of Watkins's trial, before Boone was decided.
As we explained in Boone, even prior to our decision in that case
"[o]ur trial level courts have recognized the general scientific acceptance of the cross-race effect (see e.g. People v Norstrand, 35 Misc 3d 367 [Sup Ct, Monroe County 2011]; People v Williams, 14 Misc 3d 571 [Sup Ct, Kings County 2006]; People v Radcliffe, 196 Misc 2d 381 [Sup Ct, Bronx County 2003], affd 23 AD3d 301 [1st Dept 2005]). This Court too has had occasion to observe the significance of the effect. In People v Abney (13 NY3d 251 [2009]), we held that a trial court erred in refusing, without the benefit of a Frye hearing, to allow an expert witness to testify on cross-racial identification and other factors affecting accuracy of identification (see id. at 268; see also People v LeGrand, 8 NY3d 449, 454 [2007])" (Boone, 30 NY3d at 528-529 [Fahey, J.]).
[*11]{**42 NY3d at 656}Consequently, prior to this Court's decision in Boone the importance of a cross-racial identification charge was evident in cases involving eyewitness identifications of people of different races. Notably, the importance of such a charge was not at issue in Boone, rather the issue was simply whether a court had discretion to deny a request for the charge in certain circumstances. As the Boone Court pointed out, for many years before Boone was decided, courts and scholars recognized the general scientific acceptance of the cross-race effect and the benefit of jury charges on cross-racial identifications. This is information that Watkins's counsel should have known at the time of trial in order to provide effective representation.[FN1]
Indeed, as early as 2008, the ABA recommended that courts administer cross-racial identification charges in any applicable case, even without testimony from an expert, due to the widespread acceptance of the science. Then, in 2011, for the same reasons, the New York State Justice Task Force recommended the charge, also irrespective of whether an expert testified. Additionally, in 2011, six years before Watkins's trial, New York's model Criminal Jury Instructions (CJI) added a new subsection into the One Witness charge—a cross-race identification instruction, which read as follows:
"You may consider whether there is a difference in race between the defendant and the witness who identified the defendant, and if so, whether that difference affected the accuracy of the witness's identification. Ordinary human experience indicates that some people have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race. With respect to this issue, you may consider the nature and extent of the witness's contacts with members of the defendant's race and whether such contacts, or lack thereof, affected the accuracy of the witness's identification. You may also consider the various factors I have detailed which relate to the circumstances surrounding the identification (and you may consider whether there is other evidence which supports the accuracy of the identification)" {**42 NY3d at 657}(CJI2d[NY] Identification—One Witness [as rev Jan. 2011]).
Given that at the time of Watkins's trial the importance and availability of cross-racial identification charges was well documented in New York, even if
"[a] reasonable defense lawyer at the time of [Watkins's] trial might have doubted that [the court would always grant a cross-racial identification charge] . . . [,] no reasonable defense lawyer could have found [the likelihood of the charge being granted to be] so weak as to be not worth raising[;] [y]et [Watkins's] trial counsel did not raise it" (People v Turner, 5 NY3d 476, 482-483 [2005]).
Of course, it is true that at the time of Watkins's trial we had long vested trial courts with discretion over the content of eyewitness identification charges (see People v Knight, 87 NY2d 873 [1995]; People v Whalen, 59 NY2d 273, 279 [1983]), while noting that "the better practice is to grant a defendant's request and give the expanded charge" (Whalen, 59 NY2d at 279). Indeed, the Appellate Division had at times relied upon that precedent to uphold a trial court's exercise of discretion to omit the cross-racial portion of the identification charge where the defendant neither introduced expert testimony regarding the cross-race effect nor cross-examined the People's witnesses about their ability to identify people of the defendant's race (see e.g. People v Boone, 129 AD3d 1099 [2d Dept 2015]).
But that does not mean that at the time of Watkins's trial a court could not abuse its discretion as a matter of law by failing to grant a cross-racial identification charge under facts similar to this case, or that counsel reasonably should have been unaware of the availability of the charge. Indeed, on similarly concerning facts, the concurrence in Boone would have held "that the trial court abused its discretion in denying defendant's request for a cross-racial identification charge" (30 NY3d at 538 [Garcia, J., concurring]).[FN2]
{**42 NY3d at 658}Thus, even under the discretionary approach applied pre-Boone and at the time of Watkins's trial, Watkins was entitled to a cross racial identification charge, if it had been requested, and it would have been an abuse of discretion for the court to deny it. This is apparent because the facts of this case are even more concerning than those in Boone, given that in Boone there were two eyewitnesses (see id.), and here there was only one.[FN3]
Consequently, despite what the majority contends, this case is far more like Debellis than any of the cases relied on by the majority.[FN4] Like the defendant in Debellis, Watkins "would have been entitled to [the] jury charge" that his counsel failed to request (40 NY3d at 437), inasmuch as the court would have abused its discretion as a matter of law by denying the request. Furthermore, here "attorney error deprive[d] . . . defendant of a jury charge on the only defense supported by the evidence" (id. at 438), in this case the defense of honest-but-mistaken identification. Thus, "it cannot be said that the defendant received a fair trial" (id. at 438-439). And this unfairness cannot be contested by contending that Watkins is "confus[ing] 'true ineffectiveness with mere losing tactics and accord[ing] undue significance to retrospective analysis' " (id. at 439). "No reasonable strategy could have supported counsel's failure to request a jury charge on [the cross-race effect]" due to the tremendous risk of misidentification here (id.).{**42 NY3d at 659}
However, the majority claims that the reasonableness of defense counsel's failure to request a cross-racial identification charge should be judged by particular instances in which the Appellate Division found a court's denial of a cross-racial identification instruction did not amount to an abuse of discretion (see majority op at 
644 n 4). But even assuming for the sake of argument that this is correct, the focus should be on the precedent of the Appellate Division, First Department, because that was the appellate court with direct jurisdiction over Watkins's trial.
However, the First Department cases relied upon by the majority for that claim were outdated at the time of Watkins's trial in 2017, and thus they have no bearing on this dispute. Two of those cases were decided 6 to 18 years prior to the ABA's 2008 recommendation that courts administer cross-racial identification charges even without expert testimony on the cross-race effect (see majority op at 
642-643, citing People v Applewhite, 298 AD2d 136, 137 [1st Dept 2002], and People v Jenkins, 166 AD2d 237, 238 [1st Dept 1990]). And all of the First Department cases cited by the majority were decided years to decades before the New York State Justice Task Force's and the CJI's recommendations in 2011 (see id.). In fact, the most recent First Department case cited by the majority was a 2008 case where, unlike here, corroborating evidence supported the victim's identification of the defendant, and the [*12]First Department concluded that the trial court did not abuse its discretion in denying the charge (see id.; People v Washington, 56 AD3d 258, 259 [1st Dept 2008]).
Even putting aside the irrelevance of the First Department cases cited by the majority, an erroneous determination by the Appellate Division does not make ineffective assistance of counsel somehow effective (compare Debellis, 40 NY3d at 438 [holding that, just because "a court believed that (defendant's) testimony was far-fetched, that cannot justify his lawyer's (failure to) request . . . an instruction that fit the very theory of the case"], with People v Debellis, 205 AD3d 555, 555 [1st Dept 2022] ["There was no reasonable view of the evidence that defendant's conduct satisfied the requirements of that statute, and as a result counsel's failure to request such an instruction did not constitute ineffective assistance"]). And without a record of counsel's request for a jury instruction, a court's error in{**42 NY3d at 660} denying the instruction or in upholding that denial will not be preserved.[FN5]
Even the majority must acknowledge "the cross-racial identification charge as a powerful tool for assisting juries in determining whether there has been a mistaken identification, thereby reducing the risk of wrongful convictions caused by the cross-race effect" (majority op at 
645). Here, the sole evidence linking Watkins to the assault was the victim's cross-racial identification; the sole defense theory was honest-but-mistaken identification; and the identification testimony came exclusively from Pena, who had no prior familiarity with the assailant, was of a different race than the assailant, and had only a few seconds under the stress of a violent assault to observe the assailant. Furthermore, the cross-racial identification charge may well have been the dispositive factor providing the jury with a reasonable doubt that Pena accurately identified Watkins as the assailant, given the various other factors undercutting Pena's identification in this case:
• The identification took place across the street six days after the incident;
• Watkins did not confess or make any statements to the police;
• There was no video footage showing the assailant's face;
• Pena had been struck around the eye socket before he initially viewed the assailant at a distance of 15-20 feet away;
[*13]
• {**42 NY3d at 661}During Pena's confirmatory identification, his orbital bone injury caused him dizziness, headaches, and facial swelling, along with his "forgetting things."
These concerns are compounded by the fact that, as understood by courts and scholars even before Watkins's trial,
"[M]ost eyewitnesses think they are telling the truth even when their testimony is inaccurate, and because the eyewitness is testifying honestly (i.e., sincerely), he or she will not display the demeanor of the dishonest or biased witness. Instead, some mistaken eyewitnesses, at least by the time they testify at trial, exude supreme confidence in their identifications" (Boone, 30 NY3d at 531, quoting State v Henderson, 208 NJ 208, 236, 27 A3d 872, 889 [2011]; see Jules Epstein, The Great Engine That Couldn't: Science, Mistaken Identifications, and the Limits of Cross-Examination, 36 Stetson L Rev 727, 772 [2007]).
Accordingly, trial counsel's neglecting to request a cross-racial identification charge was "a failure to present a crucial defense supported by the evidence[, which] constitute[d] ineffective assistance" (Debellis, 40 NY3d at 436). I would therefore reverse the Appellate Division and order a new trial.

Dissenting opinion by Rivera, J. 
Rivera, J. (dissenting). Race is a social construct.
Science does not support the popularly-held idea that race is a fixed human characteristic immune from societal reinterpretation and manipulation. Geneticists agree the "differences that we see in skin color do not translate into widespread biological differences that are unique to groups" (see Natalie Angier, Do Races Differ? Not Really, Genes Show, NY Times, Aug. 22, 2000 [discussing geneticists' findings]; see also Ian F. Haney Lopez, The Social Construction of Race: Some Observations on Illusion, Fabrication, and Choice, 29 Harv Civ Rts-Civ Liberties L Rev 1 [1994]). In other words, under the skin we are more alike than different. But while human classifications based on race have limited biological significance, racial taxonomies bear heavy legal weight. The most obvious example is the use of "whiteness" and "the precept of black inferiority and white superiority" to legitimize the enslavement of Africans and people of African descent (see A. Leon Higginbotham, Jr., The Precept of Inferiority, in Shades of Freedom, Racial Politics and Presumptions of the American Legal Process at 9 [1996];{**42 NY3d at 662} see also Nancy DiTomaso, The invention of race and the persistence of racial hierarchy: White privilege, White supremacy, and White colorblindness, 18 Soc & Personality Psych Compass [Apr. 2024] [explaining that there was no "meaningful concept" of race until "slavery was racialized and codified into law"]; Melanie E.L. Bush, Race, Ethnicity, and Whiteness, 29 Inst of Race Relations 1, 9 [framing "(r)acial domination" as a tool in "the process of nation-state building"]). Racial classifications retained their legal significance, even after the end of slavery, with the rise of Jim Crow and de jure and de facto racial discrimination (see James Beeby & Donald G. Nieman, The Rise of Jim Crow, 1880-1920, in A Companion to the American South at 336 [John B. Boles ed 2002] [citing "the emergence of white demagogues and their exploitation of race" and "the growth of pseudo-scientific racism" as factors contributing to the "development of segregation"]). As such, racial identity has been contested and reframed within our legal system (Cheryl I. Harris, Equal Treatment and the Reproduction of Inequality, 69 Fordham L Rev 1753, 1762-1763 [2001]). Indeed, "the law has always been deeply implicated in assigning, negotiating and defining race," and legal conceptualizations of race have changed over time (id.).
At one time, certain national origin groups were treated as nonwhites. For example, "the Irish were first categorized as a sort of racial other, neither white nor black," and were "racialized" according to cultural stereotypes (David A. Gerber & Alan M. Kraut, Becoming White: Irish Immigrants in the Nineteenth Century, in American Immigration and Ethnicity at 161, 162 [2005]). "Gradually . . . through a distribution of political power and economic power," the Irish began to be "admitted into the ranks of American white people" (id.). Italian immigrants were similarly considered a racial "other," often working in jobs "coded as 'black' by local customs" and "mobiliz[ing] alongside people of color" (Jennifer Guglielmo, Introduction: White Lies, Dark Truths, in Are Italians White? How Race is Made in America at 11 [Jennifer Guglielmo & Salvatore Salerno eds 2003]). Decades of "state-sanctioned white supremacy" gave "Italians, eastern European Jews, and other southern and eastern Europeans, who may not have identified as white, a powerful reason to assert such an identity" (id. at 12).
Spanish-speaking persons from the Caribbean and Latin America and their generational descendants residing in the United States have a similar history of racialization. Mexicans{**42 NY3d at 663} were classified and discriminated against as a non-white population, subject to segregation in school and excluded from juries (see Judith Pérez-Soria, Mexican immigrants in the United States: A review of the literature on integration, segregation and discrimination, 18 Estudios Fronterizos 1 [2017]; Hernandez v Texas, 347 US 475, 480-481 [1954] [finding that "systematic exclusion" from jury service of "persons of Mexican descent" violated equal protection]; Clare Sheridan, "Another White Race:" Mexican Americans and the Paradox of Whiteness in Jury Selection, 21 L & Hist Rev 109 [2003] [discussing Hernandez]; Westminster School Dist. of Orange County v Mendez, 161 F2d 774, 781 [9th Cir 1947] [holding that "segregation of school children of Mexican descent" violated equal protection and due process]). And Puerto Ricans have been racialized as a justification for continuing the colonial status of Puerto Rico (see De Lima v Bidwell, 182 US 1 [1901]; Downes v Bidwell, 182 US 244 [1901]). In the Insular Cases, the United States Supreme Court "describe[d] inhabitants of Puerto Rico and other unincorporated territories as 'savage tribes' and 'alien races' " in order to deny their "equal humanity" (Natalie Gomez-Velez, What U.S. v. Vaello-Madero and the Insular Cases Can Teach About Anti-CRT Campaigns, 94 NY St BJ 20, 21 [Mar./Apr. 2022]). Recently, in United States v Vaello-Madero, Justice Gorsuch criticized the Court for "leav[ing] the Insular Cases on the books," observing that the cases "are shameful" and "claim support in academic work of the period, ugly racial stereotypes, and the theories of Social Darwinists" (596 US 159, 184-186 [Gorsuch, J., concurring]). Justice Sotomayor agreed that "it 'is past time to acknowledge the gravity' of the error of the Insular Cases," which "were premised on beliefs both odious and wrong" (id. at 194 n 4 [Sotomayor, J., dissenting]).
The terms "Hispanic," "Latino," "Latina," Mexican American, Dominican American and similar formulations have been deployed to emphasize ethnicity and national origin as a political and social organizing category. Those terms have acquired legal meaning (see Office of Management and Budget, Revisions to OMB's Statistical Policy Directive No. 15: Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity, 89 Fed Reg 22182-01 [Mar. 29, 2024] [setting standard definitions of races and ethnicities]; U.S. Equal Employment Opportunity Commission, EEOC Enforcement Guidance on National Origin Discrimination, [Nov. 2016] [defining "Hispanic" as an "ethnic or national origin group( )" {**42 NY3d at 664}for purposes of employment discrimination claims]; Figueroa v Pompeo, 923 F3d 1078, 1083 [DC Cir 2019] [stating that "(u)nder established law, Title VII covers discrimination based on Hispanic or Latino ethnicity"]). This has complicated official racial categorization of what is ostensibly an ethnic population—the federal government has adopted a position that Hispanics can be of any race (United States Census Bureau, U.S. Census Bureau Guidance on the Presentation and Comparison of Race and Hispanic Origin Data [Dec. 2021], available at https://www.census.gov/topics/population/hispanic-origin/about/comparing-race-and-hispanic-origin.html).
"Since the United States legislatures and agencies decided to classify people who trace their national origin to . . . any . . . country that was once ruled by Spain as 'Hispanic,' courts have been struggling to determine exactly who belongs in the classification" and have been unable "to define [the term] consistently or accurately" (Lisette E. Simon, Hispanics: Not a Cognizable Ethnic Group, 63 Univ of Cincinnati L Rev 497, 506 [1994]). For example, some legislatures and agencies include persons from Portuguese-speaking countries, while others limit the term to apply only to persons of "Mexican, Puerto Rican, Cuban, Central or South American" descent (id. at 508-509). Until recently, the Census Bureau—as required by the Office of Management and Budget (OMB)—"define[d] 'Hispanic or Latino' as a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race" (United States Census Bureau, About the Hispanic Population and its Origin [Apr. 15, 2022] [emphasis added], available at https://www.census.gov/topics/population/hispanic-origin/about.html [last accessed Apr. 29, 2024]). That definition is still evolving. Earlier this year, the OMB revised it to "individuals of Mexican, Puerto Rican, Salvadoran, Cuban, Dominican, Guatemalan, and other Central or South American or Spanish culture or origin" (Revisions to OMB's Statistical Policy Directive No. 15, 89 Fed Reg at 22188).
In Village of Freeport v Barrella, the Second Circuit attempted to "unravel[ ] the legal definitions of 'race' and 'Hispanic' " under title VII, citing the government's "less-than-straightforward use of those terms" (814 F3d 594, 602 [2d Cir 2016]). The Court also observed that mainstream media "sometimes identifies 'Latinos' with 'blacks,' and at other times rounds 'Hispanic' to 'white' " (id. at 602-603). "As a result, courts and litigants alike have struggled with the proper{**42 NY3d at 665} characterization" of discrimination claims by "Hispanic" people, with some courts treating "Hispanic" as a "protected class . . . without saying whether that protection derives from race or national origin" (id. at 606, citing de la Cruz v New York City Human Resources Admin. Dept. of Social Servs., 82 F3d 16, 20 [2d Cir 1996]). The Barrella court held that, for the purposes of title VII claims, it would treat "Hispanic" as an ethnic group (id. at 607). The court reasoned that, although it may not "resonate with Hispanics themselves," the Census Bureau refers to "Hispanic or Latino" as an ethnicity, and the Supreme Court has long defined "racial discrimination" within the section 1981 context to include discrimination based on "ancestry or ethnic characteristics" (id. at 602, 605-606). The court acknowledged the issue is "complicated [and] vexed," and thus held "only that for purposes of Title VII, 'race' encompasses ethnicity" (id. at 606-607).
In People v Hernandez, this Court affirmed the denial of a Batson challenge regarding two Latino jurors who indicated they were fluent in Spanish (75 NY2d 350 [1990], affd 500 US 352 [1991]). The prosecutor claimed he was "not certain as to whether [the jurors were] Hispanics," but felt that their Spanish fluency "might create difficulties in their accepting the official court interpreter's translation of the testimony of Spanish-speaking witnesses" (id. at 354). The Court accepted that explanation as a "legitimate neutral ground" for a peremptory strike (id. at 356). Amici in that case, the Mexican American Legal Defense and Educational Fund and the Commonwealth of Puerto Rico, argued that "disparate treatment based upon the linguistic [*14]identity of Hispanics equals national origin discrimination" because "Hispanics . . . retain their sociolinguistic identity" and "English-Spanish bilingualism" is so common as to be an "identifying characteristic" (brief of amici curiae in support of petitioner at 4-5). Amici framed proficiency in Spanish as a "common attribute" of people with a shared Hispanic social or cultural identity, not the language of a single race (id. at 16).
Why does any of this matter to this appeal? First, because defendant claims he was denied meaningful legal representation because his trial counsel did not request a cross-racial jury charge. Resolution of that claim is difficult because the record is unclear as to the victim's demographic identity. The victim testified that he was born in the Dominican Republic and lived there until 1989, when he relocated to Puerto Rico and later{**42 NY3d at 666} New York City. When the investigating officer took the stand, defense counsel asked him the race of the complainant, and the officer responded "Hispanic." But, as already discussed, "Hispanic" is not a racial category.
Second, to the extent defendant relies on People v Boone, we made clear that our holding there was limited to "cross-racial identification[s]" (30 NY3d 521, 526 [2017] [emphasis added]). Boone involved a black defendant and "a single white witness" (id. at 529). Citing studies on cross-race effect, we held that "when identification is an issue in a criminal case and the identifying witness and defendant appear to be of different races, upon request, a party is entitled to a charge on cross-racial identification" (id. at 526 [emphasis added]). Those studies conclude that the cross-race effect has its genesis during a person's early development and affects their perceptions in adulthood (S.G. Young et al., Perception and Motivation in Face Recognition: A Critical Review of Theories of the Cross-Race Effect, 16 Personality & Soc Psych Rev 116, 121-124 [2011] [reviewing "developmental evidence" showing that "early experience 'tunes' face processing" to same-race faces, and cross-race effect may actually "be reversed by extensive childhood experience" with cross-race faces]). We expressly left open the question whether the same rule applies where the witness and defendant are from different ethnic or national origin groups, and to what extent racial self-identification matters for purposes of the analysis.
Against this backdrop, the investigating officer's description of the victim as "Hispanic" cannot be dispositive as to whether the victim was of a different race than defendant for cross-racial identification purposes. As for the victim's description, racial and ethnic identity are nuanced throughout the Caribbean and Latin America. Latinos, and those who identify as Afro-Latinos, reference a diasporic history. In the Dominican Republic, where the victim was born, "[e]stimates of Afro-descent . . . range from about a quarter to nearly 90% of the population depending on whether the estimates include those who identify as 'indio,' a group that includes many nonwhites and mixed-race individuals with African ancestry" (Gustavo López & Ana Gonzalez-Barrera, Afro-Latino: A deeply rooted identity among U.S. Hispanics, Pew Research Center [Mar. 1, 2016, updated May 2, 2022]). One survey placed the percentage of white Dominicans—people of predominant or full European descent—at less than 18% (Fondo de Población de {**42 NY3d at 667}las Naciones Unidas, Breve Encuesta Nacional de Autopercepción Racial y Étnica en la República Dominicana [Sept. 2021]). Thus, describing the victim as "Hispanic" tells us nothing about his self-identification or his socially constructed race or appearance. How and why the victim may or may not identify as a member of a different racial group from defendant are unknown. However, on appeal, the parties have identified the victim and defendant as of different races. Therefore, I assume the same, and the question left open in Boone must be answered another day.
The majority concludes that, at the time of defendant's trial, "a legal argument in support of the cross-racial identification charge" was not "so compelling that a failure to make it amounted to ineffective assistance of counsel" (majority op at 
644). I disagree and join in full Judge Troutman's well-reasoned dissent. As my colleague explains, courts and scholars recognized the cross-race effect long before we decided Boone, and since 2011, the Criminal Jury Instructions has recommended, where applicable, a cross-racial identification instruction. Therefore, "the importance of instructing juries as to the dangers of cross-racial identifications was widely understood" at the time of defendant's trial (Troutman, J., dissenting op at 
652). Accordingly, defense counsel had a basis to request that the jury be given a cross-racial identification charge (id. at 
658).
Chief Judge Wilson and Judges Garcia, Singas and Cannataro concur, Chief Judge Wilson in a concurring opinion. Judge Troutman dissents in an opinion, in which Judge Rivera concurs in a separate dissenting opinion.
Order affirmed.

Footnotes

Footnote 1:The issues raised in Judge Rivera's dissent therefore have no bearing on our resolution of this appeal (see Rivera, J., dissenting op at 
666-667 ["(O)n appeal, the parties have identified the victim and defendant as of different races. Therefore, I assume the same"]).

Footnote 2:The Justice Task Force was created in 2009 to identify patterns and practices that may contribute to wrongful convictions and recommend measures aimed at preventing such convictions.

Footnote 3:In light of this Court's decision in Boone, the CJI was amended to reflect that the jury "should consider," rather than "may consider," cross-racial differences (compare CJI2d[NY] Identification—One Witness [as rev Jan. 2011] [emphasis added], with CJI2d[NY] Identification—One Witness [as rev Jan. 2018] [emphasis added]).

Footnote 4:Judge Troutman's dissent notes several aspects of the identification testimony here that may raise questions about its accuracy (see Troutman, J., dissenting op at 
660-661), and points out that in Boone, this Court held that refusal to give a cross-racial identification instruction when requested was an abuse of discretion, given the facts of that case (id. at 
657-658 & n 2). That does not resolve the question before us here: whether defense counsel was ineffective for the sole reason that he did not request a similar instruction, in the face of Appellate Division precedent affirming denial of the charge under similar circumstances. Much of the dissent's argument simply fails to grapple with this distinction, or the different legal standards applicable to each inquiry. Moreover, our holding is consistent with Debellis, in which the defendant was "entitled" to an instruction that defense counsel failed to request, such that "the jury was deprived" of a "charge on the only defense supported by the evidence" (40 NY3d at 438; see Troutman, J., dissenting op at 
659-660). Here, by contrast, this Court expressly stated in Boone that the requirement to give an instruction upon request was "new" (30 NY3d at 537), and Watkins thus could not have been entitled to it prior to our decision. Additionally, the trial court here gave the expanded identification instruction to account for the honest-but-mistaken misidentification defense. Finally, our rejection of defendant's single-error ineffective assistance claim rests on application of our precedent, not any concern with shielding attorneys from civil liability (see Troutman, J., dissenting op at 
660 n 5).

Footnote *:The ABA has described "high quality" representation as an appropriate goal for representation in serious criminal cases, emphasizing that individuals facing deprivations of liberty deserve more than minimally effective or competent representation (ABA Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process, Achieving Justice: Freeing the Innocent, Convicting the Guilty at xxv [2006]).

Footnote 1:The fact that Watkins's trial took place while the appeal in Boone was pending in this Court is relevant, if at all, only to further demonstrate why trial counsel should have been aware of the importance of requesting a cross-racial identification charge in these circumstances.

Footnote 2:Notably, the concurrence's disagreement with the majority in Boone was not over the generally understood importance of requesting cross-racial identification charges when relevant. Rather the concurrence disagreed with the majority's creation of what the concurrence denominated "a new rule that purports to 'require[ ]' a cross-racial identification charge upon request" (30 NY3d at 538). Additionally, the majority in Boone did not disagree with the concurrence that, under already existing precedent, the trial court abused its discretion as a matter of law. Rather, the majority decided to make a broader holding because "the recent developments in the understanding of wrongful convictions and cross-racial eyewitness identifications described above demand a new approach" (id. at 537).

Footnote 3:The irony of the majority's position is that they are using the greater protections against mistaken identifications afforded by Boone as the ground for providing Watkins with less protection from ineffective assistance of counsel (see majority op at 
644-645 n 4). This is the result of the majority's misunderstanding of the state of the law at the time of Boone. Although requiring a cross-racial identification charge whenever requested was a "new" approach created by the Boone majority, the Boone concurrence recognized that, even under existing law, the defendant in that case was entitled to the charge. The difference between the Boone majority and the Boone concurrence, therefore, was that the majority determined that cross-racial identification charges are a blanket entitlement, whereas the concurrence thought that entitlement to the charge should be determined on a case-by-case basis (see e.g. 30 NY3d at 545 [Garcia, J., concurring]).

Footnote 4:Contrary to the cases relied upon by the majority, at the time of Watkins's trial the existence of the cross-race phenomena and the availability of a cross-racial identification charge was not a "novel question[ ]," and there is no question that the use of the instruction would have been compelling given the facts here (majority op at 
640).

Footnote 5:I agree with the concurrence that "[w]e should want indigent defense to be funded" to ensure that defendants are supplied with competent counsel that is not overworked and underfunded (Wilson, Ch. J., concurring op at 
646). In writing this dissent, I do not mean to disparage underfunded counsel for indigent defendants. Like all people, attorneys sometimes make mistakes and fail to take reasonable action, especially when they are overworked and underfunded. Those failures certainly should not subject defense counsel to draconian sanctions, which "could have a chilling effect on the willingness of the already strapped defense bar to represent indigent accused" (Dombrowski v Bulson, 19 NY3d 347, 352 [2012]). For that reason, we held in Dombrowski that a "plaintiff [did] not have a viable claim for damages" against defense counsel for malpractice, even though the attorney provided ineffective assistance of counsel (id. at 352). Given such protections against liability, there is no need in this State to lower the bar of effective representation as a means of artificially decreasing attorneys' fallibility, especially when it leads to defendants being deprived of fair trials. When a defendant is denied a fair trial due to ineffective representation, we should correct the error, even if that error has its roots in a broader systemic problem.